THE STATE OF OHIO, APPELLEE, *v.* BRYAN, APPELLANT.

[Cite as *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971.]

(No. 2001–0253—Submitted October 7, 2003—Decided March 17, 2004.)

_____

O'DONNELL, J.

{¶ 1} In this appeal, defendant-appellant, Quisi Bryan, raises 19 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstances against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm the defendant's convictions and sentence of death.

{¶ 2} On June 25, 2000, Cleveland police officer Wayne Leon stopped a car driven by Quisi Bryan, the defendant-appellant, because of an altered temporary license tag on the back of the car. Unknown to Officer Leon, two warrants had been issued for Bryan's arrest. As Officer Leon stood in the street next to his

police cruiser checking Bryan's identification, Bryan pulled a .45 caliber semi-automatic Glock from his coat and shot Leon, killing him instantly. Bryan then got back into his vehicle and drove away.

{¶ 3} Kenneth Niedhammer, owner of a private security agency, had been stopped at a nearby intersection, witnessed the killing, and followed Bryan's car. During Niedhammer's pursuit, Bryan stopped his vehicle on two occasions and shot at him. Eventually, Bryan crashed his vehicle into some parked cars and fled on foot. Later that evening, Bryan was arrested by police officers in Columbus, Ohio.

{¶ 4} The grand jury indicted Bryan on three counts of aggravated murder. Count 1 charged Bryan with purposely causing the death of a law enforcement officer whom the defendant knew to be engaged in his duties. Count 2 charged Bryan with purposely causing the death of a law enforcement officer and with the specific purpose to do so. Count 3 charged Bryan with the aggravated murder of Officer Leon with prior calculation and design.

{¶ 5} The three aggravated murder counts each contained identical death penalty specifications: murder of a police officer engaged in his duties pursuant to R.C. 2929.04(A)(6), murder for the purpose of killing a police officer pursuant to R.C. 2929.04(A)(6), murder to escape detection, apprehension, trial, or punishment for another offense pursuant to R.C. 2929.04(A)(3), and murder as a "course of conduct" in killing or attempting to kill two or more people pursuant to R.C. 2929.04(A)(5).

{¶ 6} Bryan was charged with the attempted murder of Niedhammer in Counts 4 and 5, and felonious assault for discharging a firearm into the Matthews dwelling in Counts 6, 7, and 8, and improperly discharging a firearm in Counts 9, 10, and 11. Count 12 charged Bryan with carrying a concealed weapon, Count 13 charged him with carrying a firearm as a convicted felon, and Count 14 charged him with tampering with evidence. Firearms specifications were included in Counts 1 through 11. Prior to trial, the trial court dismissed Counts 6 through 10, and the counts were renumbered.

{¶ 7} To establish Bryan's guilt, the state presented Niedhammer's eyewitness testimony of Leon's shooting, Bryan's admissions of guilt, forensic evidence concerning the murder weapon, and DNA evidence connecting Bryan to the getaway car. Following trial, a jury convicted Bryan of the aggravated murder of Officer Leon and the attempted murder of Niedhammer and recommended a penalty of death.

### State's Case

{¶ 8} Early in 2000, Quisi Bryan, who was at the time married, began living together with Janie Winston, his 18–year–old girlfriend, at her Cleveland resi-

dence. Bryan supported himself by selling drugs and "hitting licks," i.e., robbing other drug dealers. He owned a revolver, carried a Glock .45 caliber semiautomatic handgun, and at all times, kept a shotgun hidden inside Winston's mattress. At that time, he told Winston that his parole officer was looking for him because he "had got caught up with writing his name on some cashier's checks and—or traveler's checks." He told Winston, though, "I'm going to go in under my own terms." In fact, Bryan had been indicted for theft and receiving stolen property, and arrest warrants had been issued alleging him to be a parole violator.

{¶ 9} Around 11:00 or 11:30 p.m. on Saturday, June 24, 2000, Bryan told Winston that he was leaving the house to "hit a lick." She did not hear from him again until late the next morning.

### The murder of Leon.

{¶ 10} Around 11:00 a.m., on Sunday, June 25, 2000, while alone on routine patrol in his police cruiser, Officer Wayne Leon apparently noticed irregularities on the temporary license tag on Bryan's Pontiac Grand Prix. Leon followed Bryan's car as it stopped at a Sunoco service station located at the corner of East 40th Street and Community College Avenue.

{¶ 11} Officer Leon and Bryan both exited their vehicles after stopping. Leon first inspected Bryan's temporary tag and noticed that it had been altered. He then obtained Bryan's driver's license to run a police check on him and on the vehicle.

{¶ 12} Officer Leon and Bryan stood next to the cruiser as Leon called the station using his police radio transmitter on his right shoulder. Leon's right hand was on the radio transmitter and his left hand was holding Bryan's driver's license. As Leon turned his head to talk over the radio, Bryan pulled his Glock handgun from his coat and shot Leon in the face. As Leon lay on the ground, Bryan retrieved his driver's license, returned to his car, and sped away. Officer Leon died from that gunshot.

### The attempted murder of Niedhammer.

{¶ 13} While waiting at a traffic light next to the Sunoco station, Kenneth Niedhammer heard the gunshot and saw a police officer lying on the pavement. Niedhammer then saw a white Pontiac Grand Prix drive erratically from the Sunoco station. Niedhammer, who was driving a private security vehicle, pursued the Grand Prix. While in pursuit, Niedhammer activated the security vehicle's siren and flashing lights.

{¶ 14} On East 39th Street, Bryan stopped behind a vehicle driven by Cad Holly Matthews, who was waiting at a stop sign. Bryan exited his Grand Prix and started shooting at Niedhammer. One of Bryan's shots hit a spotlight on

Niedhammer's vehicle, which was only six to eight inches from Niedhammer's head. A ricochet from another shot bruised Niedhammer's forearm. One of Bryan's shots also struck an upstairs bedroom window in Matthews's nearby home near where Matthews's granddaughter, her fiancé, and their eight-month-old son were sleeping. Niedhammer stopped, exited his vehicle, and returned fire.

{¶ 15} Following the exchange, Bryan sped away with Niedhammer in pursuit. After a few more blocks, Bryan stopped again, got out of his car, and again fired at Niedhammer. Niedhammer stopped his vehicle behind Bryan's car and fired two or three shots at Bryan. After a minute or so, Bryan returned to his car and drove away with Niedhammer in pursuit.

{¶ 16} Bryan eventually lost control of his vehicle and collided with several parked cars and a church van. Although dazed by the crash, Bryan grabbed his backpack and gun and ran away.

{¶ 17} After running a short distance from the crash scene, Bryan approached a group of men and asked whether he "could pay somebody to drop him off because guys was after him." For $30, Barry Philpot drove Bryan to a designated location and dropped him off. Bryan threw his Glock handgun into a nearby dumpster, went to his wife Elaine Bryan's home, and fled in her blue Dodge Spirit.

{¶ 18} Bryan then called Winston, told her "that something happened" and that she should "[p]ack up some clothes." He met Winston at a supermarket, and they drove to his father's home. Bryan obtained a handgun from his father's house and put it under the car seat. Bryan and Winston then drove to Columbus.

{¶ 19} While driving to Columbus, Bryan told Winston, "I hope he don't die. * * * I shot a police officer in the face." Bryan explained that a police officer had stopped him, "they exchanged words, and [Bryan] pulled out his gun, put it to his head * * * and [as] the officer was reaching for his [gun] * * * [Bryan] shot him." Bryan also said, "I just can't go back under their terms. I'm going to go under mine. * * * [I]f this man dies, I will never see the day of light again or I will just get life in prison. Janie, I just can't go back."

{¶ 20} In Columbus, Bryan drove to an ex-girlfriend's house and tried unsuccessfully to buy some crack cocaine. He then told Winston, "Well, we going to catch a train to Pennsylvania. Then from Pennsylvania we going to fly to Florida. Then from there we going to try to leave the country."

{¶ 21} While looking for a Columbus hotel, Bryan offered a stranger, Gerald Alfred, money to rent a hotel room for them. During the late afternoon on June 25, Bryan and Winston went into the hotel room with Bryan's backpack, which

contained .45 caliber and .357 magnum cartridges, parts of a shotgun, two shotgun rounds, and gun-cleaning equipment. Winston placed the handgun that Bryan had obtained from his father's house underneath the bed in the hotel room.

{¶ 22} Bryan told Winston that Alfred was going to help him look for some crack. Bryan left the room and told Winston that he would be "right back." When Bryan did not return, Alfred drove Winston to the Greyhound station so that she could return to Cleveland. She put the handgun into Bryan's backpack and took it with her.

{¶ 23} By the time Bryan and Winston had arrived in Columbus, Cleveland police had already identified him as the main suspect in Leon's shooting by tracing the Pontiac's temporary license tag. From Elaine Bryan, they obtained a description of the Dodge Spirit that Bryan was driving, and they broadcast a description of Bryan and the Dodge Spirit to police departments throughout Ohio and surrounding states.

{¶ 24} Later that same day, Columbus Police Sergeant Tyrone Hollis spotted the Dodge Spirit, stopped his cruiser behind it, and arrested Bryan. As Bryan was being escorted to the police cruiser, he said, "I didn't shoot the cop. I was there." When he was in the cruiser, Bryan also blurted out, "I didn't pull the trigger."

{¶ 25} Police later learned that Alfred had rented a hotel room for Bryan and a young lady. After police located Alfred, he described Winston and said that she was at the Greyhound station. Police then arrested Winston and seized Bryan's backpack.

{¶ 26} Around 3:00 a.m. on June 26, Cleveland Police Detective Michael O'Malley attempted to interview Bryan in Columbus. As Bryan was brought to the roll-call room, he said, "You probably think I'm some kind of animal." After O'Malley advised Bryan of his *Miranda* rights, Bryan said that he did not wish to talk about the incident. However, Bryan did say, "I feel sorry for the officer and things aren't like they seem."

{¶ 27} Following Officer Leon's murder, police investigators showed eyewitnesses a photo array to identify Leon's assailant. Neither Geneva Marie Jefferson, who had witnessed the shooting at the Sunoco station, nor Niedhammer was able to identify Bryan from a photo array. Similarly, neither George Abou–Nader nor Donnell Wingfield, then Sunoco station employees, was able to identify Bryan when first shown his photograph. However, Jefferson later identified Bryan as the assailant when she saw his picture on television. Wingfield and Abou–Nader also later identified Bryan when shown updated photographs of him. On June 28, Niedhammer identified Bryan from an updated photograph in a second photo array.

{¶ 28} During the course of their investigation, police investigators recovered a .45 caliber shell casing at the Sunoco station. At the location of the second shooting, they also found five .45 caliber shell casings and a copper-colored jacket from a bullet. Police also removed a spent .45 caliber bullet embedded in a door of Matthews's home.

{¶ 29} At trial, Cleveland Detective Thomas Lucey testified that the same Glock handgun fired the bullet recovered from Leon's body and the bullet and copper jacket recovered from the second shooting scene. Each bullet had eight lands and grooves and a right-hand twist. Moreover, unique impressions left on each bullet were characteristic of the manufacturing process of Glock barrels.

{¶ 30} According to Detective Lucey, the same Glock handgun ejected the .45 caliber shell casings found at the Sunoco station and at the second shooting scene. This conclusion was based on four points of comparison: firing pin impressions, breech face markings, and extractor and ejector markings.

{¶ 31} Following Bryan's arrest, police found "two unique gunshot residue particles" on Bryan's right hand. Gunshot residue was also found on the driver's door handle inside Bryan's Grand Prix and in the roof area behind the driver's side rear window.

{¶ 32} Julie Heinig, a forensic scientist, concluded that biological DNA material removed from an inhaler and two cigar butts found in the Grand Prix contained Bryan's DNA profile. In the case of the inhaler, the probability of finding another individual with the same DNA profile was more than one in a hundred trillion for Caucasians and more than one in a quadrillion for African–Americans.

{¶ 33} Dr. Stanley Seligman, a deputy coroner, testified that Leon died as the result of a single gunshot to the head and neck. In addition, the coroner recovered a .44 or .45 caliber, copper-jacketed bullet from Leon's body. Stippling on his face showed that Leon was shot from a distance of approximately two and one-half feet. Moreover, the bullet's trajectory was consistent with testimony that Leon's face was turned to the right when he was shot.

### Defense Case

{¶ 34} Bryan testified in his own behalf. He disclosed that he had been released on parole on November 2, 1998, for attempted robbery, that his parole was scheduled to end on December 2, 1999, and that he had married Elaine in September 1999.

{¶ 35} In November 1999, Bryan's parole officer had informed him that he was being investigated for receiving stolen property and could not be released from parole because of a pending indictment. Bryan did not return to visit his parole officer, explaining, "I thought * * * I would be arrested." To avoid arrest, Bryan left his wife and moved in with Winston.

{¶ 36} He further admitted that he supported himself by selling drugs and that he owned a .45 caliber Glock, a .357 caliber revolver, and a shotgun. Elaine purchased the Glock in her name because he was a convicted felon.

{¶ 37} According to Bryan, Officer Leon stopped him on June 25 for driving with altered license tags. After further inspecting the tags, Leon called them "fictitious." Leon then started talking into his radio mike, and Bryan was "trying to think of a way to convince him to stop." Bryan then pulled a handgun, "pointed it at his mike," and said, "Don't do that." Bryan testified that in response, Leon jumped back, pivoted, and his "right hand came down towards his weapon." Bryan then shot Leon.

{¶ 38} Bryan further testified that after the shooting, he drove off at a high rate of speed. Bryan saw a security car following him and stopped behind Matthews's car at East 39th Street and Central. Bryan said that he had planned to leave his car and run away. However, he said, "[a]s soon as I opened the door and jumped out, I was fired on." Bryan testified that he then fired four or five shots at Niedhammer, got back into his car, and sped away. Bryan denied that he had shot at Niedhammer two separate times.

{¶ 39} After hitting the church van, Bryan left his vehicle, took his Glock handgun and backpack, and fled on foot. Bryan later threw the Glock into a dumpster.

{¶ 40} Bryan denied that he intended to kill Officer Leon. Rather, he said, "I just wanted to convince him * * * with the weapon not to call on the mike." According to Bryan, he said that he "pointed right at the mike" when he shot him. Bryan said that he was "very remorseful" after shooting Leon, insisting "There's not a day that goes by that I don't think about it." During cross-examination, Bryan said that he had pulled the trigger as just "a reflexive motion to [Leon's] jump."

### Trial Result

{¶ 41} The jury found Bryan guilty of all charges, except Count 3 (aggravated murder of Officer Leon with prior calculation and design) and the original Count 11 (now Count 6) (improperly discharging a firearm), and recommended the death penalty. Thereafter, the trial court merged the specifications for Counts 1 and 2 and sentenced Bryan to death for the murder and to prison for the remaining offenses.

{¶ 42} Bryan now appeals to this court as a matter of right.

### Pretrial and Jury Issues

{¶ 43} *Constitutionality of R.C. 2903.01(E).* In proposition of law II, Bryan challenges the constitutionality of R.C. 2903.01(E). Bryan argues that since R.C.

2903.01(E) duplicates R.C. 2929.04(A)(6), all murders of law enforcement officers have become capital offenses in violation of the constitutionally mandated narrowing requirement for death penalty eligibility.

{¶ 44} R.C. 2903.01(E), part of the aggravated murder statute, and R.C. 2929.04(A)(6), which identifies an aggravating circumstance, contain almost identical language. R.C. 2903.01(E) provides:

{¶ 45} "No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

{¶ 46} "(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

{¶ 47} "(2) It is the offender's specific purpose to kill a law enforcement officer."

{¶ 48} R.C. 2929.04(A)(6) provides:

{¶ 49} "(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment * * *.

{¶ 50} "* * *

{¶ 51} "(6) The victim of the offense was a law enforcement officer * * * whom the offender had reasonable cause to know or knew to be a law enforcement officer * * *, and either the victim, at the time of the commission of the offense, was engaged in the victim's duties, or it was the offender's specific purpose to kill a law enforcement officer as so defined."

{¶ 52} In *Jurek v. Texas* (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, the Supreme Court upheld the Texas capital scheme that imposed capital punishment in five circumstances. The Supreme Court noted the appellate court's holding that the law " 'limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses. This insures that the death penalty will only be imposed for the most serious crimes [and] * * * that [it] will only be imposed for the same type of offenses which occur under the same types of circumstances.' " Id. at 270, 96 S.Ct. 2950, 49 L.Ed.2d 929, quoting *Jurek v. State* (Texas Crim.App.1975), 522 S.W.2d 934, 939. Similarly, R.C. 2903.01(E) narrows the class of persons eligible for the death penalty by focusing on the purposeful murder of a law enforcement officer or murder occurring while the law enforcement officer is engaged in his or her duties.

{¶ 53} The narrowing requirement may occur at either the guilt phase or the sentencing phase of a capital trial but need not occur at both. In *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568, the Supreme Court

reviewed a death sentence where the sole aggravating circumstance was identical to an element of the charged capital crime. In upholding the death sentence, the Supreme Court ruled that "the 'narrowing function' was performed by the jury at the guilt phase * * *. The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." Id. at 246, 108 S.Ct. 546, 98 L.Ed.2d 568.

{¶ 54} This court addressed an analogous statutory scheme in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264. *Jenkins* upheld the constitutionality of the death penalty for a defendant convicted of felony murder under R.C. 2903.01(B) and sentenced in accordance with the aggravating circumstance equivalent to it, R.C. 2929.04(A)(7). *Jenkins* noted that "any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option." Id. at 178, 15 OBR 311, 473 N.E.2d 264. See, also, *State v. Henderson* (1988), 39 Ohio St.3d 24, 28–29, 528 N.E.2d 1237; *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 349 (duplication of felony murder conviction and felony murder aggravating circumstance is constitutional because the narrowing function was performed by the jury during the guilt phase).

{¶ 55} The *Jenkins* analysis applies with equal force to R.C. 2903.01(E) and to the corresponding aggravating circumstance of R.C. 2929.04(A)(6). Here, the jury performed the narrowing function when it found Bryan guilty under R.C. 2903.01(E) of murdering Officer Leon. The jury's finding as to the corresponding R.C. 2929.04(A)(6) aggravating circumstance was not part of the constitutionally required narrowing process. See *Lowenfield,* 484 U.S. at 246, 108 S.Ct. 546, 98 L.Ed.2d 568. Accordingly, we overrule this proposition of law.

{¶ 56} *Denial of continuance.* In proposition of law VI, Bryan claims that the trial court erred by denying a defense request for a continuance. Denial of the continuance gave Bryan's counsel approximately 100 days to prepare for trial.

{¶ 57} " 'The grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.' " *State v. Jones* (2001), 91 Ohio St.3d 335, 342, 744 N.E.2d 1163, quoting *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 423 N.E.2d 1078. In evaluating a motion for a continuance, "[s]everal factors can be considered: the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed ·to the delay and other relevant factors." *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.

{¶ 58} Bryan was indicted on July 5, 2000, and his trial began on October 23, 2000. During pretrial sessions, the trial court informed counsel that no continuances would be granted. At an August 1 pretrial conference, the state assured the trial court that in July the defense had been provided answers to discovery and a bill of particulars, results of lab testing, autopsy reports, and all other information acquired by that time during the investigation. The trial court asked the defense to bring to its immediate attention any discovery problems. The prosecutors also offered investigative assistance if the defense had any difficulty in locating or contacting witnesses.

{¶ 59} On October 12, the defense filed a motion for a continuance. On October 23, the defense told the court that there were 130 to 140 witnesses on the state's witness list, and to be thorough, the defense needed to interview them. The defense also requested more time to discover and interview potential witnesses to determine whether or not they should be called to the stand. Additionally, the defense claimed that eyewitnesses and potential character witnesses displayed reluctance to come forward and that more time was needed to encourage them. The defense motion was denied.

{¶ 60} The trial court did not abuse its discretion in denying this continuance. Although defense counsel claimed that they needed more time, the defense did not specify the additional time needed. Moreover, the defense failed to identify any witnesses they were unable to interview. Similarly, counsel failed to identify reluctant witnesses needed in presenting the defense case. Thus, the defense presented vague and speculative justifications for a continuance. See *State v. Spirko* (1991), 59 Ohio St.3d 1, 18, 570 N.E.2d 229 (defendant's failure to show "particularized need" supported denial of a continuance); *State v. Green* (2000), 90 Ohio St.3d 352, 368, 738 N.E.2d 1208 (defendant's failure to present "specific" reasons why he needed more time supported denial of continuance).

{¶ 61} Another factor supporting the trial court's denial of the requested continuance concerned the required trial delay of at least two months, and the court expressed concern about scheduling issues and the future availability of witnesses. See *State v. Jones*, 91 Ohio St.3d at 342, 744 N.E.2d 1163.

{¶ 62} Bryan's argument that his counsel did not have adequate time to interview Winston about her two inconsistent statements is not well taken. The record shows that defense counsel effectively impeached Winston's testimony at trial. During cross-examination, Winston admitted that she did not tell the whole truth in her first statement and made conflicting statements about Bryan's admissions. Thus, Winston's cross-examination proved successful, and this argument is unpersuasive.

{¶ 63} Bryan also contends that it was "per se unreasonable" to limit the defense to a little more than three months to prepare for his capital murder trial.

Thus, Bryan argues that this court should establish a "presumption of unreasonableness" if a trial court fails to grant the defense a continuance within 180 days from the date of the offense. By way of analogy, Bryan argues that R.C. 2953.21(A)(2) provides the defense six months to prepare a petition for postconviction relief.

{¶ 64} Bryan's contention that three months' preparation for a capital murder trial is "per se unreasonable" and that "prejudice should be presumed" is unfounded. Bryan, for example, fails to explain how his counsel could have tried his case differently if granted a continuance. Eyewitness testimony, forensic evidence, DNA testing, and Bryan's own admissions of guilt provided convincing evidence of his guilt. Thus, if granted, whether a continuance would have made any difference in the outcome of this trial becomes speculative. Moreover, other capital cases have been tried in Ohio with the same preparation time. See *State v. Beuke* (1988), 38 Ohio St.3d 29, 37, 526 N.E.2d 274 (two and one-half months' trial preparation); *State v. Benner* (1988), 40 Ohio St.3d 301, 303, 533 N.E.2d 701 (two and one-half months' trial preparation).

{¶ 65} Further, in preparing for trial within the time allotted, Bryan's defense counsel had ample resources, including an investigator, a mitigation specialist, and a psychologist. Despite the availability of these resources, the defense presented only Bryan's testimony during the guilt phase of trial and his mother's testimony and Bryan's unsworn statement during the penalty phase.

{¶ 66} In *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921, the Supreme Court stated, "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances * * *, particularly in the reasons presented [when] the request is denied." Thus, as in the instant case, the trial court was in the best position to rule on the requested continuance after reviewing the facts. Finally, Bryan's comparisons with the statutorily allotted time to file a petition for postconviction relief are inapposite. Based on the foregoing, we overrule proposition VI.

{¶ 67} *Jury challenges.* In proposition of law I, Bryan argues that the trial court improperly excused juror Bross after the jury had been impaneled. Bryan also contends that the trial judge had improper ex parte communications with Bross prior to excusing him.

{¶ 68} The record reveals that, on October 30, 2000, Bross expressed concern to the court bailiff that his photograph had appeared in the Cleveland Plain Dealer. The trial judge briefly talked to Bross and "told him not to mention it to any fellow jurors, that [the judge] would look into the matter and discuss it with him sometime later." Thereafter, the trial judge obtained a copy of the photo-

graph, informed counsel for both sides of the juror's concern, and said that they would address the issue later.[1]

{¶ 69} On October 31, the trial judge spoke to Bross, who expressed reservations about continuing as a juror. On November 1, the trial judge and counsel conducted a hearing about Bross's concerns. During questioning, Bross stated, "The concern * * * is that people may recognize me wherever, at home, at work, on the street or supermarket or other places from that picture [and] it might affect what I have to do as a juror." During ensuing questions, the trial judge told Bross, "I've looked at you for eight days. I wouldn't be able to identify you from this photograph." Bross asserted that the news photograph would not affect his ability to decide guilt or innocence. However, when asked about deliberating on the death penalty, Bross said, "I'm just thinking that somehow that can be put on me."

{¶ 70} Following Bross's responses, the trial court stated, "I'm just thinking that this * * * photograph is not the issue. I'm beginning to think that the issue is * * * the possible imposition of capital punishment in this case." When asked if he could sign a death penalty verdict, Bross said "No" and mentioned that his death penalty views had "evolved" since the trial began. The trial court and Bross then had the following discussion:

{¶ 71} "Q: This photograph is not—I don't want to call it a false issue. It's an issue. It's a concern of yours.

{¶ 72} "A: Yes.

{¶ 73} "Q: But bottom line is, when we were in the courtroom last week during individual voir dire, your response to the question about whether or not you could sign a death warrant was yeah, * * * you could follow the law?

{¶ 74} "A: Yes.

{¶ 75} "Q: Today it is no, you could not, is that correct?

{¶ 76} "A: That is correct.

{¶ 77} "Q: * * * In part that's due to the photograph, but in part it's due to the fact that the photograph has triggered you to do some additional thinking; is that fair to say?

{¶ 78} "A: Yes."

{¶ 79} Over defense objection, the trial judge excused Bross and replaced him with an alternate juror.

---

1. The photo shows the backs of the jurors as the jurors stand outside the Sunoco station during the jury view.

{¶ 80} The standard for determining whether a prospective juror may be excluded for cause is whether that juror's views on capital punishment would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. This test applies whether the juror favors capital punishment or opposes it. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 86, 656 N.E.2d 643. A trial court's ruling on a challenge for cause will not be disturbed on appeal unless the trial court abused its discretion. See *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Moreover, the same standards apply where, as in this case, a seated juror informs the court that he or she can no longer follow the law and sign a death verdict.

{¶ 81} Here, the trial court did not abuse its discretion. Bross stated that he could not follow the law during the penalty phase and could not sign a death penalty verdict. Thus, Bross was properly excused.

{¶ 82} Bryan's argument that the trial court erred by excusing Bross during trial is ill-founded. Crim.R. 24(F)(1) provides that "[a]lternate jurors * * * shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."[2] Moreover, in *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, paragraph three of the syllabus, this court held, "Crim.R. 24(F) is not violated in a capital case where an alternate juror is substituted for another juror after the guilt phase verdict, but before deliberations begin in the penalty phase." Thus, even though the trial had begun, the trial court did not abuse its discretion in excusing Bross once Bross stated had that he could no longer follow the law.

{¶ 83} Bryan's complaint of prejudicial error because of the trial court's brief ex parte discussions with Bross can also be dismissed. Trial counsel did not object to the ex parte discussions. Moreover, during the hearing in chambers, trial counsel never asked Bross about his ex parte communications with the trial judge or the effect such communications had upon Bross's ability to continue as a juror. Thus, Bryan waived all but plain error. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 121, 734 N.E.2d 1237.

{¶ 84} The trial court's ex parte discussions with Bross were not plain error. To establish prejudice from such ex parte communications, "the complaining party must first produce some evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473

---

2. Crim.R. 24(F)(2) provides that such procedure shall be the same in capital cases.

N.E.2d 264, paragraph thirteen of the syllabus. The complaining party must also show actual prejudice. *State v. Hessler,* 90 Ohio St.3d at 122, 734 N.E.2d 1237; *State v. Johnson* (2000), 88 Ohio St.3d 95, 107–108, 723 N.E.2d 1054. Here, the trial judge's discussions with Bross were very brief, and once the trial judge became aware of Bross's concerns, a hearing with both counsel was conducted. Thus, the lack of prejudice is manifest. Based on the foregoing, we reject proposition I.

{¶ 85} In proposition of law III, Bryan argues that the trial court erred by rejecting a challenge for cause against McClellan, a member of the jury, because she said that she could not impose a penalty less severe than death.

{¶ 86} A capital defendant may challenge for cause any prospective juror who, regardless of the evidence of aggravating and mitigating circumstances and in disregard of the jury instructions, will automatically vote for the death penalty. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Williams* (1997), 79 Ohio St.3d 1, 6, 679 N.E.2d 646. A trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion. See *State v. Wilson,* 29 Ohio St.2d at 211, 58 O.O.2d 409, 280 N.E.2d 915.

{¶ 87} During voir dire, McClellan initially revealed a predisposition to vote for the death penalty. When defense counsel asked McClellan about voting for the death penalty, she said, "If it is recommended, then * * * I don't know if I would consider anything other. That is kind of a hard question." In answering the prosecutor's followup questions, McClellan stated, "I would follow the law." Questioning continued with the following discussion:

{¶ 88} "The Court: Could you impose a sentence less than death in that case?

{¶ 89} "Ms. McClellan: No.

{¶ 90} "The Court: You could not?

{¶ 91} "Ms. McClellan: No.

{¶ 92} "The Court: So, in other words, you could not follow the law? If you want to ask me any questions, if you are confused, go ahead.

{¶ 93} "Ms. McClellan: I am. I am still confused. You are saying that the aggravating circumstances is proved and it outweighs—

{¶ 94} "The Court: No. What I'm saying is this: In order to apply the death penalty, the aggravating circumstances must outweigh the mitigating factors.

{¶ 95} "Ms. McClellan: That's right.

{¶ 96} "The Court: * * * If it was just the opposite—let's say that the prosecution wasn't able to prove that. * * * Could you then impose life or life with parole at 30 or 25?

{¶ 97} "Ms. McClellan.  I could.  I could.

{¶ 98} "The Court:  So what you are saying is you could follow the law?

{¶ 99} "Ms. McClellan: Yes."

{¶ 100} While McClellan was obviously confused by the questioning, her follow-up responses demonstrated her willingness to follow the law, evaluate mitigating factors, and consider a lesser sentence under appropriate circumstances.  Given these answers, the trial court did not abuse its discretion in rejecting the challenge to McClellan for cause.  See *State v. Treesh* (2001), 90 Ohio St.3d 460, 469, 739 N.E.2d 749 (juror's predisposition in favor of imposing death penalty did not require challenge where the juror later stated that she would follow the law and the court's instructions).  We overrule proposition III.

{¶ 101} In proposition of law IV, Bryan argues that the trial court improperly excused two prospective jurors for cause who were not unequivocally opposed to the death penalty.

{¶ 102} During voir dire, prospective juror Hawkins expressed her opposition to the death penalty because of Biblical teachings.  When asked if she could sign a death penalty verdict, Hawkins said, "I just don't want to kill anyone" and "I just don't want to be part of the killing."  While Hawkins was willing to follow the law, she stated, "I don't want to" sign the death penalty verdict form.  Over defense objection, the trial court excused Hawkins for cause.

{¶ 103} During voir dire, prospective juror Bailey stated, "I cannot support the death penalty."  Bailey stated that she "would certainly try" to follow the law.  However, when the prosecutor asked whether she could sign the death penalty verdict, Bailey said, "I doubt it."  Over defense objection, the trial court excused Bailey for cause.

{¶ 104} When Hawkins's and Bailey's answers are examined under the *Witt* standard, it is clear that the trial court did not abuse its discretion in excusing them for cause.  Moreover, " '[t]he fact that the defense counsel was able to elicit somewhat contradictory viewpoints from these jurors during his examination does not, in and of itself, render the court's judgment erroneous.' "  *State v. Beuke,* 38 Ohio St.3d at 38, 526 N.E.2d 274, quoting *State v. Scott* (1986), 26 Ohio St.3d 92, 98, 26 OBR 79, 497 N.E.2d 55.  Further, "deference must be paid to the trial judge who sees and hears the juror."  *Wainwright v. Witt,* 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841.  Finally, we summarily overrule Bryan's argument that *Witt* should be rejected as the governing standard.  See *State v. Rogers,* 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.  Accordingly, we find that proposition IV has no merit.

{¶ 105} In proposition of law V, Bryan claims that the prosecutor peremptorily excused Crystal Jones, an African–American prospective juror, because of her race. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 106} "A court adjudicates a *Batson* claim in three steps." *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." Id. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. Id. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. See, also, *Purkett v. Elem* (1995), 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395.

{¶ 107} Jones was peremptorily challenged without objection. Following the state's peremptory challenge of Reginald Flowers, another African–American, the defense claimed that both prospective jurors were improperly challenged because they were African–Americans.[3] The trial court withheld its ruling on whether there was a prima facie case of racial discrimination until it had heard the state's response.

{¶ 108} The prosecutor provided several racially neutral reasons for peremptorily challenging Jones. The prosecutor noted Jones's reference in her juror questionnaire to The Ox–Bow Incident, a story involving a miscarriage of justice and the lynching of an innocent man. The prosecutor also mentioned that when jurors were asked whether they felt pressure to return a certain verdict due to community views, Jones responded by nodding her head in an affirmative fashion. Moreover, the prosecution stated that Jones indicated that she was very inconvenienced by the jury selection process and that her mannerisms showed that she was offended by the questions being asked.[4] After hearing the prosecutor's explanation, the trial court rejected the *Batson* challenge, finding no prima facie case and no evidence of racial discrimination.

---

3. Bryan has withdrawn his *Batson* claim regarding Flowers. Flowers, a corrections officer, had had contact with Bryan at the Cleveland city jail and had participated in the funeral of the victim.

4. Jones was the cousin by marriage of the former Cuyahoga County Prosecuting Attorney. However, this relationship was not mentioned as a reason for her peremptory challenge.

{¶ 109} The facts support the trial court's decision. During voir dire, Jones discussed The Ox–Bow Incident and acknowledged her concern about a rush to judgment and a lynch-mob mentality. Furthermore, Jones's affirmative response about feeling community pressure to return a certain verdict provides another race-neutral explanation.

{¶ 110} Despite his assertions, Bryan offers no evidence of discriminatory intent. The burden of proving intentional discrimination was his. Moreover, "[t]he trial court's finding is entitled to deference, since it turns largely 'on evaluation of credibility.'" *State v. White* (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140, quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 21.

{¶ 111} Bryan also argues that Jones's removal meant that there were no African–Americans on the jury, and thus he was denied a fair cross-section of jurors from the community. However, we also reject this claim.

{¶ 112} The Sixth Amendment guarantee to a jury trial "contemplates a jury drawn from a fair cross-section of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690. However, there is "'no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.'" *State v. Johnson*, 88 Ohio St.3d at 117, 723 N.E.2d 1054, quoting *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. 692, 42 L.Ed.2d 690. See, also, *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus.

{¶ 113} Bryan has presented no evidence of any attempt to systematically exclude African–Americans from the jury-selection process. Bryan's claim is based solely on the lack of African–Americans sitting on his jury. However, underrepresentation of a group on a single jury does not constitute systematic exclusion. *State v. McNeill* (1988), 83 Ohio St.3d 438, 444, 700 N.E.2d 596; *Ford v. Seabold* (C.A.6, 1988), 841 F.2d 677, 685.

{¶ 114} In summary, Bryan has failed to show either a *Batson* violation or that his jury lacked a fair cross-section of the community as required by *Taylor*. Accordingly, we overrule proposition V.

### *Trial Issues*

{¶ 115} *Sufficiency of the evidence.* In proposition of law XI, Bryan argues that the state failed to prove that he was guilty of the attempted murder of Niedhammer.

{¶ 116} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 117} R.C. 2903.02 proscribes murder as follows: "(A) No person shall purposely cause the death of another * * *." R.C. 2923.02(A) defines "attempt" as "purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, * * * engage[ing] in conduct that, if successful, would constitute or result in the offense."

{¶ 118} Bryan argues that the evidence fails to establish that he purposely attempted to murder Niedhammer. As he testified at trial, Bryan asserts that he was trapped behind another vehicle on East 39th Street, got out of his car, and attempted to flee. He claims that Niedhammer fired at him first and that he only returned fire.

{¶ 119} The jury clearly rejected Bryan's version of events. Niedhammer and Matthews testified that Bryan stopped at East 39th Street, got out of his car, and fired several shots at Niedhammer. At the scene, police recovered five .45 caliber shell casings ejected from Bryan's gun. Moreover, Bryan's gunshots struck the car's spotlight, which was only six to eight inches from Niedhammer's head. Such evidence clearly established his intent to kill Niedhammer. *State v. Treesh,* 90 Ohio St.3d at 486, 739 N.E.2d 749 (attempted aggravated murder conviction upheld where defendant got out of his car and fired multiple shots at a pursuing police officer).

{¶ 120} Bryan also denies that there was a second exchange of gunfire with Niedhammer. However, Niedhammer's testimony established that Bryan stopped on a second occasion, got out of his car, and shot at Niedhammer. A witness corroborated Niedhammer's version, hearing three gunshots coming from the direction of this shootout just prior to Bryan's collision at East 71st Street. Again, the jury could reasonably conclude that Bryan was guilty of attempted murder when he fired at Niedhammer a second time.

{¶ 121} Finally, we reject Bryan's claim that the evidence was insufficient because he twice left the scene without injuring Niedhammer. See *State v. Jenkins,* 15 Ohio St.3d at 220, 15 OBR 311, 473 N.E.2d 264 ("a claim that no harm resulted to a potential victim is no defense to a charge of attempted murder"). Based on the foregoing, we find that proposition XI lacks merit.

{¶ 122} *Other acts.* In proposition of law VIII, Bryan argues that the court improperly admitted "other acts" testimony into evidence.

{¶ 123} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 124} Bryan argues that the trial court, over defense objection, erred in permitting Winston to testify that Bryan told her he had been in prison for selling drugs and that he had "hit licks" and carried guns. Here, Bryan's prison record and his on-going criminal misconduct combined with other evidence of outstanding arrest warrants demonstrated his motive for shooting Leon when Leon was checking Bryan's identification. Cf. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226, citing *State v. Henness* (1997), 79 Ohio St.3d 53, 61, 679 N.E.2d 686 (defendant's need for drugs as probative of a motive to steal and kill).

{¶ 125} Bryan also claims that the trial court, over defense objection, erred in admitting Donnell Wingfield's testimony. Wingfield testified that Bryan "robbed people" for a living, robbed "drug boys mostly," and associated with "dope boys" who "rob people." When the defense moved for a mistrial because of Wingfield's testimony, the state argued that such evidence explained why Wingfield was a reluctant witness and did not tell the police on June 25 that he saw Bryan shoot Officer Leon.

{¶ 126} Wingfield's testimony that Bryan and his associates "robbed people" is hearsay. Moreover, the state offered it as evidence of "other crimes, wrongs, or acts" to prove Bryan's bad character. See Evid.R. 404(B). Wingfield's testimony about Bryan's robberies should not have been admitted, since it did not " 'tend to show' by substantial proof" motive or any of the other exceptions under Evid.R. 404(B). See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶ 127} However, Wingfield's testimony in this case did not result in prejudicial error, considering the overwhelming evidence of Bryan's guilt. Cf. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 48 ("other act" of purchasing crack cocaine of minor significance compared to the gravity of the aggravated murder of a policeman and evidence harmless beyond a reasonable doubt).

{¶ 128} Moreover, Wingfield's testimony that Bryan robbed people and robbed mostly dope boys was cumulative of other evidence. As mentioned, Bryan had told Winston that he "hit licks." The defense also stipulated during the guilt phase that Bryan had been convicted of attempted robbery in 1995 and impris-

oned and was under indictment for receiving stolen property at the time of the murder. Proposition VIII lacks merit.

{¶ 129} ***Prosecutorial misconduct.*** In proposition of law VII, Bryan complains about prosecutorial misconduct during the guilt phase.

{¶ 130} **Impeachment.** First, Bryan complains that the prosecutor improperly cross-examined him about the details of a prior robbery conviction. During the state's case, the parties stipulated that Bryan had been convicted of attempted robbery on January 31, 1995, and was sentenced to two to ten years in prison. During the defense case, Bryan testified that he had been convicted of attempted robbery and of receiving stolen property, and twice for carrying a concealed weapon.

{¶ 131} Bryan argues that the prosecutor improperly cross-examined him about the underlying facts of the robbery conviction when the prosecutor, over objection, referred to the attempted robbery as a "car jacking," questioned whether the defendant "put a .38 against somebody's head and dragged them out of their car," and asked whether Bryan "threaten[ed] to shoot this person if they didn't give up their car." Furthermore, Bryan claims that the prosecutor improperly elicited details about the conviction by asking Bryan, over objection, to tell the jury "about this car jacking."

{¶ 132} When an accused testifies at trial, Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused was convicted of an offense punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Generally, a prosecutor can cross-examine as to " 'the name of the crime, the time and place of conviction, and sometimes the punishment.' " However, " 'details such as the victim's name and the aggravating circumstances' " are not permissible. 1 Giannelli & Snyder, Evidence (2d Ed.2001), Section 609.15, at 473, quoting 1 McCormick (5th Ed.1999), Section 42, at 167. Nevertheless, the trial court "has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609." *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923, syllabus; see, also, *State v. Amburgey* (1987), 33 Ohio St.3d 115, 117, 515 N.E.2d 925.

{¶ 133} At trial, the prosecutor extensively questioned Bryan about the underlying facts of his robbery conviction. Such questioning exceeded permissible cross-examination of a defendant about the details of a prior conviction. Cf. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 150–151 (questions concerning prior murder conviction that involved shooting the victim "with a gun" and "in the heart" were not prosecutorial misconduct); *State v. Taylor*

(1997), 78 Ohio St.3d 15, 26, 676 N.E.2d 82 (brief questioning clarifying that prior murder conviction was for two murders permissible).

{¶ 134} In this case, however, the prosecutor's misconduct in questioning Bryan is not reversible error. Here, Bryan's conviction for attempted robbery had been properly admitted into evidence, and further questioning about the facts of that conviction was harmless in view of the overwhelming evidence of his guilt. See *State v. Williams* (1988), 38 Ohio St.3d 346, 351, 528 N.E.2d 910.

{¶ 135} **Voir dire.** Bryan also claims that the prosecutor committed misconduct by making incorrect statements of law during voir dire.

{¶ 136} First, Bryan complains that the prosecutor improperly stated that the "[a]ggravating circumstances * * * are the specifications that are contained in the indictment for aggravated murder." The prosecutor erred slightly, since only the R.C. 2929.04(A) death specifications in the indictment are the aggravating circumstances. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 334, 738 N.E.2d 1178. However, Bryan did not object and waived all but plain error. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 137} Here, plain error does not exist. The trial court's penalty instructions correctly identified the aggravating circumstances. Moreover, the prosecutor's misstatement, made several days earlier in voir dire, would not have affected the penalty phase. See *State v. Campbell*, 90 Ohio St.3d at 334, 738 N.E.2d 1178.

{¶ 138} Second, Bryan argues that the prosecutor erred during voir dire by stating that "the mitigating factors * * * will be the good things that are presented in this courtroom about Mr. Bryan." However, the defense never objected, and there was no plain error. The court's instructions to the jury during the penalty phase correctly identified the relevant mitigating factors. Moreover, the prosecutor's shorthand reference to legal concepts during voir dire cannot be equated with the trial court's jury instructions. See *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (prosecutor's voir dire reference to mitigating factors as the "good things" not plain error).

{¶ 139} Third, Bryan claims the prosecutor incorrectly stated during voir dire that "if the mitigating factors in this case outweigh the aggravating circumstances," the jury will choose from the life options. The correct test is whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. See R.C. 2929.03(D)(1) and (2). However, the defense failed to object, and there was no plain error. The trial court articulated the correct standard during its penalty-phase instructions. Again, the prosecutor's inaccurate references to the weighing process were made several days prior to the penalty phase and would not have affected the trial result. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 285, 731 N.E.2d 159.

{¶ 140} Additionally, Bryan argues that the prosecutor committed misconduct when he informed Bross, a prospective juror, that the penalty verdict had to be unanimous, an assertion contrary to *State v. Brooks* (1996), 75 Ohio St.3d 148, 160, 661 N.E.2d 1030. However, prejudice was impossible, since Bross was later excused. Finally, the trial court's penalty-phase instructions correctly advised the jury of voting procedures.

{¶ 141} **Guilt-phase closing argument.** Bryan also claims that the prosecutor improperly commented on the victim and his family and appealed to the community's sense of outrage during the state's closing argument. However, the defense failed to object and waived all but plain error. See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 142} During closing argument, the prosecutor commented about the victim, his family, and community responsibility:

{¶ 143} "[W]hen this case is just a memory to you, ladies and gentleman, Officer Leon's small children will go on a journey of their own to find out what kind of a father they had. And ultimately that journey will take them here to this courtroom.

{¶ 144} "Ultimately, ladies and gentlemen, their mother, their grandfather, their uncles, their friends, their colleagues will all say something about who Wayne Leon was but ultimately it will be your decision * * * that will define Wayne Leon.

{¶ 145} "In the years that I've been doing this, * * * I have been blessed with the opportunity to try homicide cases, a blessing because you get to observe people who are the tragic witnesses of very, very tragic events, family members.

{¶ 146} "And you wonder how can they possibly go on? How could they possibly get through the day? They've been left with nothing, devastated. Well, that's a blessing * * * that we have been able to witness through this case.

{¶ 147} "It's that a community has come together so that the accounting for what has occurred to Wayne Leon will not go unnoticed. So that his children, when they go on the journey to discover who their father was, that they will know that he was a brave man, that he protected the community * * *.

{¶ 148} "I want to leave you with something as far as an old poem, an old writing. I always think that in the hour of death you should look to the person, the victim of the crime, and learn what * * * type of a devastating loss this has been.

{¶ 149} " 'He has lived a beautiful life and has left a beautiful field. He has sacrificed the hour to give service for all time. He has entered the company of the great and with them he will be remembered forever.' "

{¶ 150} In closing, the prosecutor added, "Let Wayne Leon's children know that when you returned your verdict, * * * that you made a search for the truth. That you had faith in the law and that, most importantly, you had faith in yourselves that you, in fact, would do the right thing here, and that would be to find justice so that they can be comforted by the fact that there is recourse to the law, that there is an accounting for the senseless killing and that their father will be remembered as a hero and not just some incidental blip on the radar screen because Quisi Bryan was having a bad day."

{¶ 151} The test for prosecutorial misconduct in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler*, 90 Ohio St.3d at 125, 734 N.E.2d 1237, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. In applying this test, we consider "the effect the misconduct had on the jury in the context of the entire trial." *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.

{¶ 152} Here, the prosecutor appealed for the jury to deliver a verdict that would search for the truth and had faith in the law. These comments do not prejudicially affect the substantive rights of Bryan in this case in view of the overwhelming evidence of his guilt. See *State v. DePew* (1988), 38 Ohio St.3d 275, 288–289, 528 N.E.2d 542 (prosecutorial misconduct not reversible when evidence of guilt is overwhelming; however, prosecutor's misconduct warranted referral to Disciplinary Counsel); *State v. Grant* (1993), 67 Ohio St.3d 465, 484, 620 N.E.2d 50 (prosecutor's reference to the jury as the "conscience of the community" was not plain error); but, cf., *State v. Keenan*, 66 Ohio St.3d at 411, 613 N.E.2d 203 (protracted improper arguments resulted in prejudicial error where evidence was not overwhelming).

{¶ 153} Based on the foregoing, we overrule proposition VII.

{¶ 154} *Ineffective assistance of counsel.* In proposition of law IX, Bryan argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires the defendant to show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington* (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 155} **Failure to request change of venue.** First, Bryan claims ineffective assistance of counsel in failing to request a change of venue due to massive pretrial publicity.

{¶ 156} Extensive pretrial publicity indeed surrounded Officer Leon's murder. However, counsel could reasonably decide as a matter of trial strategy to conduct

the trial in Cleveland instead of requesting a change of venue. See *State v. White* (1998), 82 Ohio St.3d 16, 24, 693 N.E.2d 772; *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (reviewing court "will not second-guess trial strategy decisions").

{¶ 157} Moreover, a change of venue is not automatically granted when there is extensive pretrial publicity. Any decision to change venue rests largely within the discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 251, 15 OBR 379, 473 N.E.2d 768. " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *State v. Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. Moreover, "a defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 29.

{¶ 158} Here, the defense counsel questioned jurors about pretrial publicity. Several jurors acknowledged that they had read newspapers or listened to news accounts about the case. However, each of the empanelled jurors questioned about pretrial publicity stated that he or she either had not formed an opinion about Bryan's guilt or could put aside such an opinion and render a verdict based on the law and evidence presented.

{¶ 159} Moreover, the trial court took effective steps to protect Bryan's rights. The trial court strongly and repeatedly advised the jurors not to listen to news broadcasts, read newspapers, or talk to anyone about the case.

{¶ 160} Thus, the defense counsel were not ineffective in failing to request a change of venue.

{¶ 161} **Failure to interview witness.** Bryan also argues ineffective assistance of counsel in failing to interview Winston after receiving notice of her two written statements.

{¶ 162} The prosecutor provided Winston's two written statements to the defense following her testimony and prior to defense cross-examination. During an out-of-court session, the defense complained that the prosecutor should have provided the defense with the statements earlier because Winston's statements were inconsistent and therefore exculpatory. However, the defense acknowledged that the prosecutor had informed the defense earlier about inconsistencies in her statement. The defense then cross-examined Winston without requesting a delay to interview her about her statements.

{¶ 163} It is purely speculative whether interviewing Winston before trial would have affected the outcome of the case. Moreover, counsel effectively cross-examined Winston about inconsistencies in her pretrial statements. Here,

Bryan's attorneys made a legitimate "tactical decision" to conduct Winston's cross-examination without a pretrial interview and were not ineffective. *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373; *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 123, 125.

{¶ 164} **Ineffective closing argument.** Bryan next alleges that the defense counsel delivered a closing argument that was detrimental to him. There is no merit to this argument.

{¶ 165} First, Bryan claims that defense counsel improperly referred to the R.C. 2929.04(A)(5) "course of conduct" specification as a mass-murder specification. Bryan is incorrect. The prosecutor, and not defense counsel, referred to a mass-murder specification during closing argument. Bryan also argues that defense counsel failed to object to the prosecutor's reference to the mass-murder specification throughout the trial. However, the trial court's instructions correctly identified the elements of the R.C. 2929.04(A)(5) specification and eliminated any prejudice to Bryan. See *State v. Davie* (1997), 80 Ohio St.3d 311, 330, 686 N.E.2d 245.

{¶ 166} Second, Bryan argues ineffective assistance in that his counsel, during his final argument, rhetorically asked himself on behalf of the public, "How can you represent that cop killer?" Further, Bryan claims that his counsel improperly argued, "Take a second. A courtroom full of police officers and mourners. I don't know how many times you've looked to your left throughout these proceedings. Mourners and police officers. Now they have a right to be here[,] * * * but let's not ignore the fact that that places an awful lot of pressure on you all."

{¶ 167} Here, the defense counsel's rhetorical dramatization of the difficulty of representing a "cop killer" emphasized the jury's responsibility to fairly evaluate the evidence in the case. The comment about police officers and mourners in the court served as a reminder that the jury could not allow their presence to distract the jury "to hold the prosecutor to his burden." We find no deficient performance when the defense presented such argument.

{¶ 168} Bryan also argues that his counsel improperly argued victim-impact evidence to the jury. Here, Bryan complains about his counsel's argument that "[t]his is an officer who died in his thirties. * * * That's absolutely tragic. I'm not trying to minimize that. * * * I'm not trying to dismiss it. I will never dismiss it." Bryan also complains that his counsel argued, "I understand the natural inclination to be sympathetic toward Officer Leon's family. I want you to be. I just don't want that to affect your decision making when you are talking about purposeful."

{¶ 169} Here, the defense counsel was trying to establish credibility with the jury by demonstrating his awareness of the jury's concern for the victim's family. Nonetheless, counsel emphasized that jurors should not be swayed from objec-

tively evaluating the evidence by their sympathy for the victim's family. This was a legitimate defense approach in contending that Bryan should be convicted of a lesser offense. "Given * * * the 'strong presumption' that counsel's performance constituted reasonable assistance, counsel's actions must be viewed as tactical decisions and do not rise to the level of ineffective assistance." *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373; see, also, *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 155.

{¶ 170} **Failure to object to instructions, prosecutorial misconduct, and a jury challenge.** Bryan cites other instances of alleged ineffective assistance of counsel, but none of these resulted in prejudicial error. With respect to each claim, Bryan fails to show the deficiency in counsel's performance or that such conduct resulted in prejudicial error depriving Bryan of a fair trial. See *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 171} As previously discussed in connection with other propositions, defense counsel had no reasonable basis to object to the prosecutor's statements or the trial court's instructions during the death qualifying process (propositions VII and X), or the trial court's instructions on reasonable doubt (XVI) or the weighing process (X). Nor did counsel need to object to brief references equating the aggravating circumstances to the specifications or defining mitigation as "good things" about the defendant during the death qualifying process (X and VII). Moreover, counsel did not need to request the trial court to define "mitigation" during the death qualifying process (X). Further, no error was committed in failing to object to the comment on juror unanimity, since the juror (Bross) was later dismissed.

{¶ 172} Contrary to Bryan's contention, defense counsel did object to the reference to the verdict as a recommendation. Although the term was used elsewhere during the trial, defense counsel's performance cannot be considered deficient for failing to continue to object (X).

{¶ 173} Bryan has also not established prejudice by counsel's failure to object to the prosecutor's closing argument about the victim or his family (VII). Nor has he established any deficiency for failing to object to the challenge of Juror Pandya. The challenge for cause was appropriate, since Pandya opposed the death penalty and would not have been able to sign the death penalty verdict form. See *State v. Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶ 174} Based on the foregoing, we reject proposition IX.

### Penalty–Phase Issues

{¶ 175} *Prosecutorial misconduct.* In proposition of law XII, Bryan argues that the prosecutor committed misconduct throughout the penalty-phase closing

argument. However, unless noted, the defense did not object to the purported acts of prosecutorial misconduct and thus waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

{¶ 176} First, Bryan argues that the prosecutor improperly referred to him as a "running time-bomb ready to go off." However, this description is within the realm of fair comment. See *State v. Nields* (2001), 93 Ohio St.3d 6, 37, 752 N.E.2d 859 ("mean-spirited derelict" and "unemployed killer" as fair comment); *State v. Clemons* (1998), 82 Ohio St.3d 438, 451, 696 N.E.2d 1009 ("cowardly" permissible).

{¶ 177} Second, Bryan argues that the prosecutor improperly referred to the R.C. 2929.04(A)(5) specification as the "mass murder" specification. The prosecutor's comment did not result in plain error, but counsel should have referred to the R.C. 2929.04(A)(5) specification as the "course of conduct" specification.

{¶ 178} Third, Bryan cites *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, and argues that the prosecutor's argument treated the nature and circumstances of the offenses as an aggravating circumstance. The prosecutor properly stated that the jury decides whether "anything in the nature and circumstances [of the offense] should be considered mitigation." The prosecutor then reviewed key facts of the offense and, through a series of rhetorical questions (e.g., "do you see mitigation there"?), argued that the nature and circumstances of the offense presented little or no mitigation.

{¶ 179} "Although, according to *Wogenstahl,* * * * prosecutors cannot argue that the nature and circumstances of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C. 2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard* (1998), 84 Ohio St.3d 230, 238, 703 N.E.2d 286. Here, the prosecutor neither characterized nor labeled any of the facts of the offense as aggravating circumstances. Rather, the prosecutor properly argued that the nature and circumstances of the offense were not mitigating.

{¶ 180} Bryan also contends that the prosecutor committed misconduct during rebuttal argument by stating, "Aggravating circumstances, you learned all about those. Those are the incidents surrounding the homicide of Wayne Leon and the attempted murder of Mr. Niedhammer." Further, Bryan asserts that the prosecutor erred by arguing, "[Y]ou are going to find the aggravating circumstances, the horrible events of this crime that you have already found beyond a reasonable doubt, outweigh what mitigation, if any, they present to you * * *." The prosecutor's improper statements here did not result in plain error. The

trial court correctly instructed the jury that the arguments of counsel are not evidence, and it gave a correct instruction on aggravating circumstances and mitigating factors. The court should stop counsel from attempting to instruct jurors on legal matters. Here, the court's proper instruction negated any confusion arising from the prosecutor's imprecision. See *State v. Hill* (1996), 75 Ohio St.3d 195, 202, 661 N.E.2d 1068.

{¶ 181} Fourth, Bryan argues that the prosecutor committed misconduct by arguing victim impact and urging the death penalty to satisfy community outrage. "A prosecutor may not call for the jury to convict in response to public demand." *State v. Hicks* (1989), 43 Ohio St.3d 72, 76, 538 N.E.2d 1030. Here is how the prosecutor, over defense objection, argued against any juror's inclination to fail to return a death sentence: "[Y]ou are telling the ladies and gentlemen of this community, when this is published in the paper, or when you get a chance to read this, about what your verdict is * * * that it's okay to shoot a policeman now." Such argument improperly suggested that the jury could consider the response of public opinion when voting on the sentence. Similarly, we find that the prosecutor committed misconduct when arguing that "because there's community outrage doesn't necessarily mean that the community is wrong about calling for the ultimate punishment" and that the jury has "to send out the message * * * that the ultimate penalty should be applied."

{¶ 182} We also find that the prosecutor improperly commented on the testimony of Bryan's mother when arguing, "Everybody has a mom. I'm sure Wayne Leon had a mom. I'm sure that Wayne Leon's children ask their mom, 'Where is daddy?'" Such emotionally charged comments did not properly rebut any mitigating evidence or previous defense arguments. However, we find no plain error in view of the proven aggravating circumstances and the lack of significant mitigating evidence. Moreover, our independent assessment of the sentence has cured any lingering impact from the prosecutor's comments. *State v. Hartman* (2001), 93 Ohio St.3d 274, 295, 754 N.E.2d 1150.

{¶ 183} We also reject Bryan's claim of prosecutorial misconduct during other segments of the state's argument. The prosecutor's explanation that shooting a police officer is an aggravating circumstance to "preserve the public tranquility" represented fair comment. Moreover, the prosecutor committed no misconduct when arguing that "if this case is not the case that calls for the death penalty, then which one does?" Here, the prosecutor's comments were within the creative latitude accorded both parties. *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523; *State v. Nields*, 93 Ohio St.3d at 39, 752 N.E.2d 859. Bryan's actions in coldbloodedly discharging a .45 caliber semiautomatic Glock into the face of an investigating uniformed police officer precipitated the events and provided the basis of these arguments. He cannot expect less in these situations.

{¶ 184} Contrary to Bryan's claim, the prosecutor did not commit misconduct in arguing, "Is it remorse of sincerity because of the * * * horrible tragedy that he has caused here, that he has destroyed a family, that he has harmed a community, or is it remorse because of his own personal predicament?" Here, the prosecutor's comment was fair rebuttal to defense argument that Bryan had "absolutely, positively" shown remorse.

{¶ 185} The prosecutor also did not commit misconduct in arguing, "He will tell you or say * * * anything in order to protect himself so that he can survive * * *; so that he can tell the story in the prison about killing a cop, beating the rap, swindling a jury into thinking that he has some remorse * * *." Again, the prosecutor's remarks were fair rebuttal to the defense argument that, if given a life sentence, Bryan could teach other prisoners to "make different decisions than he made." See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 178.

{¶ 186} Moreover, the prosecutor's argument that Bryan was "packing all of these guns around and trying to perpetuate an image to his girlfriend, Janie Winston, that he is a true thug, a gangster, from the gold chains to the lifestyle of an outlaw" represented fair comment on the evidence. We also dismiss Bryan's argument that the prosecutor erred by referring to the verdict as a recommendation. See *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674.

{¶ 187} Finally, we reject Bryan's argument that the prosecutor's cumulative misconduct deprived him of a fair trial. *State v. Landrum*, 53 Ohio St.3d at 113, 559 N.E.2d 710. Based on the foregoing, we overrule proposition XII.

{¶ 188} ***Ineffective assistance of counsel.*** In proposition of law XIII, Bryan argues ineffective assistance of counsel during the penalty phase because counsel failed to present "viable" mitigating evidence. During the penalty phase, the defense presented Bryan's unsworn statement and his mother's testimony.

{¶ 189} The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins v. Smith*, (2003), —— U.S. ——, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471, quoting *Strickland v. Washington*, 466 U.S. at 690–691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 190} Here, the defense employed a mitigation specialist, a psychologist, and an investigator. Prior to the penalty-phase proceedings, the defense counsel informed the trial court that the mitigation specialist prepared "voluminous records relative to mitigation" and that the defense psychologist spent 15 to 30 hours interviewing Bryan. The defense counsel carefully reviewed this information, and after discussing the matter with Bryan, decided that "it was in our client's best interest" not to introduce this evidence. The defense counsel made a

strategic trial decision, which cannot be the basis for an ineffective assistance claim. See *State v. Mason*, 82 Ohio St.3d at 169, 694 N.E.2d 932.

{¶ 191} Finally, resolving this issue in Bryan's favor would require speculation. Nothing in the record before us indicates what testimony the defense experts would have presented as no proffer has been made.

{¶ 192} Bryan also claims that his defense counsel were deficient in calling his mother, Cassandra Bryan, as a witness. Cassandra testified that she "would feel very devastated" if Bryan were executed. She also stated that "executing him * * * is just going to widen the circle of grief and violence * * * and the suffering that everyone is going through."

{¶ 193} Bryan argues that calling Cassandra as a mitigation witness resulted in damaging cross-examination of her. Bryan points to cross-examination eliciting that Cassandra taught him right from wrong, taught him the value of life, taught him to respect the police, and taught him about hard work and respect for authority. Bryan also points to cross-examination eliciting that Bryan's father was involved in his life and that Bryan's actions on June 25 were contrary to his upbringing.

{¶ 194} The defense made a legitimate tactical decision to call Cassandra as a witness. His mother's testimony helped to humanize Bryan before the jury. Moreover, Bryan's argument that Cassandra's testimony was detrimental is doubtful. Indeed, testimony that Bryan was brought up in a good home with strong values can be viewed in a favorable light. Such testimony might tend to show that Bryan's crimes were an aberration and that he has rehabilitation potential.

{¶ 195} We also reject Bryan's other complaints about his mother's cross-examination. For example, Cassandra testified that she saw Bryan two months prior to the murders; however, she was unaware that he was a fugitive from justice and that he was carrying a gun. It is hard to imagine how such testimony was prejudicial, since earlier testimony established that Bryan carried a gun and was a parole violator.

{¶ 196} Finally, Bryan mentions other examples of alleged ineffectiveness of counsel, but none of these prejudiced him. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. As we discussed in connection with other propositions, Bryan was not prejudiced by his counsel's failure to object to the prosecutor's penalty-phase closing argument (proposition XII), or the prosecutor's reference to the verdict as a recommendation (X, XII). Moreover, the defense counsel were also not ineffective by failing to object to the readmission of trial-phase evidence during the penalty phase (XIV). See *State v. Sanders* (2001), 92 Ohio St.3d 245, 275, 750 N.E.2d 90.

{¶ 197} Based on the foregoing, we reject proposition XIII.

{¶ 198} *Reintroduction of trial-phase evidence.* In proposition of law XIV, Bryan argues that the trial court erred by permitting the reintroduction of all guilt-phase evidence during the penalty phase. However, the record reveals that Bryan did not raise this issue in the trial court, and has therefore waived all but plain error. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Even assuming that some of the evidence should have been excluded (e.g., autopsy photos), we find that the reintroduction of the guilt-phase evidence did not result in plain error. *State v. Sanders,* 92 Ohio St.3d at 267, 750 N.E.2d 90; see, also, *State v. DePew,* 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus. Thus, proposition XIV is without merit.

{¶ 199} *Merger.* In proposition of law XV, Bryan contends that the trial court erred in failing to merge the R.C. 2929.04(A)(5) (course of conduct) and R.C. 2929.04(A)(6) (killing a police officer) death penalty specifications. However, the defense failed to request merger and thus waived all but plain error. *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 137. Moreover, merger is not required when the aggravating circumstances arise from a divisible course of conduct. *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019.

{¶ 200} The R.C. 2929.04(A)(5) and (A)(6) specifications are not duplicative, since they did not arise from the same act or indivisible course of conduct. The R.C. 2929.04(A)(6) specification arose from the murder of Officer Leon, whereas the R.C. 2929.04(A)(5) specification arose from the attempted murder of another person. Thus, no merger was required. Cf. *State v. Jones,* 91 Ohio St.3d at 349, 744 N.E.2d 1163 (R.C. 2929.04[A][3] and [A][6] specifications treated separately); *State v. Palmer* (1997), 80 Ohio St.3d 543, 574, 687 N.E.2d 685 (R.C. 2929.04[A][5] and [A][7] specifications treated separately). Proposition XV is without merit.

### Instructions

{¶ 201} In proposition of law X, Bryan argues that the trial court provided improper instructions throughout the trial. However, except where noted, the trial counsel failed to object and waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 202} First, Bryan argues that the trial court erred during voir dire by failing to define "mitigation." At the early stage of a trial, the trial court is not required to completely instruct the jury, for example, by defining mitigation. *State v. Mason,* 82 Ohio St.3d at 164–165, 694 N.E.2d 932. Here, the trial court's preliminary instructions simply discussed penalty-phase procedures and mentioned the concept of mitigation. Moreover, the trial court provided comprehen-

sive instructions defining mitigation during the penalty phase. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 200, 702 N.E.2d 866. We find no plain error.

{¶ 203} Second, Bryan complains that the trial court's preliminary instructions improperly stated that the death penalty was appropriate where the aggravating circumstances outweighed the mitigating factors. As Bryan points out, the correct test is whether the state proved that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. See R.C. 2929.03(D)(1) and (2).

{¶ 204} Again, there was no plain error. The trial court's preliminary instructions and its penalty-phase instructions advised the jurors of the proper weighing standard. Moreover, "the judge's shorthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's penalty deliberations." *State v. Stallings*, 89 Ohio St.3d at 285, 731 N.E.2d 159. Thus, the trial court correctly instructed the jury on the applicable sentencing standard and its sentencing responsibility. See *State v. Hill* (1995), 73 Ohio St.3d 433, 438, 653 N.E.2d 271.

{¶ 205} Third, Bryan argues that the trial court's preliminary instructions improperly stated that the aggravating circumstances were the same as the specifications in the indictment. However, the trial court's penalty-phase instructions correctly identified the aggravating circumstances for the jury to consider during its penalty-phase deliberations. We find that the trial court's earlier misstatement did not result in plain error.

{¶ 206} Fourth, Bryan argues that the trial court improperly referred to the jury's sentence as a recommendation despite its ruling that the term should not be used. During voir dire, the trial court ruled that the parties should not use the word "recommendation." Thereafter, the trial court used the terms "recommend" or "recommendation" but only to jurors who were later excused. Moreover, the trial court's penalty-phase instructions did not refer to the jury's sentence as a recommendation. Rather, the trial court instructed, "[I]n the event that the jury determines death should be imposed upon the defendant, the Court may accept this finding, or I may sentence the defendant to life imprisonment with or without the possibility of parole." See *State v. Getsy*, 84 Ohio St.3d at 202, 702 N.E.2d 866 (instructions that the jury verdict is a "recommendation" accurately reflects Ohio law and not error). We find that this claim has no merit.

{¶ 207} Fifth, Bryan complains about the trial court's reference to the R.C. 2929.04(A)(5) aggravating circumstance as the "mass murder" specification. "Mass murder" is a misnomer. The case did not involve mass murders, and the term lacked relevance. However, the trial court's penalty-phase instructions properly defined the R.C. 2929.04(A)(5) aggravating circumstance as "a course of conduct in which the defendant purposely killed Patrolman Wayne Leon and also

purposely attempted to kill Kenneth Niedhammer." We find that the trial court's occasional reference to the mass-murder specification did not result in plain error, since it was abundantly clear that Bryan was not tried as a mass murderer.

{¶ 208} Sixth, Bryan contends that the trial court erred by readmitting all of the trial-phase evidence during the penalty phase and then advising the jury to consider only "that evidence * * * relevant to the aggravating circumstances." To the extent that the jury interpreted the trial court's instructions as allowing them to determine relevancy, the trial court erred. It is "the trial court's responsibility to determine the admissibility of evidence." *State v. Getsy*, 84 Ohio St.3d at 201, 702 N.E.2d 866. However, much of the trial-phase evidence was relevant to the aggravating circumstances, the nature and circumstances of the offense, and the mitigating factors. Moreover, overwhelming evidence properly admitted during the penalty phase supports the jury's finding that the aggravating circumstances outweigh the mitigating factors. See *State v. Jones*, 91 Ohio St.3d at 350, 744 N.E.2d 1163. Thus, we find that the trial court's misstatement did not result in plain error.

{¶ 209} Finally, Bryan argues that the trial court improperly referred to the first phase of the trial as the "guilt-innocence" phase. Bryan claims that this term implied that Bryan must prove his innocence and thus shifted the burden of proof. The trial court instructed, "The first phase of the case is the guilt or innocence phase. I know some people want me to say guilty or not guilty portion of the case. But is he guilty or not guilty? That is the issue." Following this explanation, none of the jurors would have believed that the trial court's reference to the first phase of the trial as the guilt-innocence phase shifted the burden of proof. See *State v. Coley* (2001), 93 Ohio St.3d 253, 268, 754 N.E.2d 1129. Moreover, the trial court repeatedly instructed the jury that the state had the burden of proof. We find that this complaint lacks merit.

{¶ 210} Based on the foregoing, we reject proposition X.

### Cumulative Error

{¶ 211} In proposition of law XVII, Bryan contends that the cumulative errors committed at his trial deprived him of a fair trial and mandate reversal of his death sentence. However, Bryan received a fair trial, and any error was nonprejudicial. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d at 212, 661 N.E.2d 1068. Proposition XVII has no merit.

### Settled Issues

{¶ 212} ***Reasonable doubt.*** In proposition of law XVI, Bryan challenges the constitutionality of the trial court's instructions on reasonable doubt in R.C.

2901.05(D) during both phases of the trial. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05. See *State v. Jones*, 91 Ohio St.3d at 347, 744 N.E.2d 1163. Thus, proposition XVI is overruled.

{¶ 213} *Proportionality.* In proposition of law XVIII, Bryan disputes the constitutionality of Ohio's death penalty proportionality review. However, these claims are without merit. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 214} *Constitutionality.* In proposition of law XIX, Bryan attacks the constitutionality of Ohio's death penalty statutes. We summarily reject these arguments. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons*, 82 Ohio St.3d at 454, 696 N.E.2d 1009; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

## INDEPENDENT SENTENCE EVALUATION

{¶ 215} *Aggravating circumstances.* The evidence established that Bryan was properly convicted of the death penalty specifications for aggravated murder, namely murder of a police officer engaged in his duties and murder for the purpose of killing a police officer, both under R.C. 2929.04(A)(6); murder for the purpose of escaping detention, apprehension, trial, or punishment for another offense under R.C. 2929.04(A)(3); and a "course of conduct" in killing or attempting to kill two or more people under R.C. 2929.04(A)(5). The trial court merged the two (A)(6) specifications prior to the jury's death penalty verdict.

{¶ 216} *Mitigation evidence.* Bryan called one mitigation witness, made an unsworn statement, and introduced documentary evidence for the jury's consideration.

{¶ 217} **Cassandra Bryan.** The defendant's mother testified that the defendant is her only child. Cassandra said that she would "feel very devastated, and it would affect [her] whole life" if Bryan were executed. Further, she testified that "everyone is * * * hurting and everyone is in pain about the whole incident that happened, * * * [but] executing him or taking his life is just going to widen the circle of grief and violence and the suffering that everyone is going through * * *."

{¶ 218} During cross-examination, Cassandra stated that she taught her son the difference between right and wrong, the need to respect the police, and the importance of hard work and the values of society. Bryan's father was present in the courtroom, and he has been involved in the defendant's life since he was a child.

{¶ 219} **Unsworn statement.** Bryan expressed his "heartfelt apologies for an act [he] committed on impulse, an unforgivable act." Moreover, Bryan regrets

letting down his mother, father, wife, and stepchildren. After his marriage to Elaine, Bryan developed a relationship with her two small children. Bryan adores these children and says that they are doing well in school. He said, "I know my children love me very much, and * * * [t]hey are deprived of the only father figure they have ever known because of me."

{¶ 220} From his own past experience, Bryan recognizes that "[p]rison is punishment." Bryan supports the "Scared Straight" program where prisoners have a chance to discourage younger offenders from an ongoing life of crime. One of Bryan's intentions was to "set up a halfway-house for eight to 18–year-olds for that same purpose."

{¶ 221} Bryan continued, "If there was anything I could do to undo what I did, I would certainly do it. If giving up my life would bring back Officer Leon, I would. I pray every night for God's forgiveness." Finally, Bryan said, "I will simply say I'm so sorry and ashamed. It's something I'm left to live with for the rest of my days."

{¶ 222} Defense exhibits A through J are various certificates awarded to his stepchildren for academic proficiency. Defense exhibit M, dated April 30, 1999, is a statement that set out Bryan's long-range goals while he participated in a community reentry program. These goals included completing parole, completing his education, and managing a halfway house for juvenile offenders. Defense exhibit N was his handwritten unsworn statement.

{¶ 223} *Victim–impact evidence.* After the jury's death penalty verdict but prior to the imposition of sentence, the trial court permitted Karen Bailey, the victim's representative, to describe the impact of Officer Leon's murder on his friends and family. Leon was the stabilizing force for his family after his mother died in 1992. Leon and his wife adored each other and their three small children. Finally, Bailey commented that Bryan "showed Wayne absolutely no mercy."

### Sentence Evaluation

{¶ 224} We find nothing in the nature and circumstances of the offense to be mitigating. After being stopped for a traffic violation, Bryan shot Officer Leon before Leon could identify and arrest him for outstanding warrants. During the high-speed chase that followed, Bryan stopped twice and fired at Niedhammer. Bryan then collided with a parked church van and fled the scene on foot. The facts establish a purposeful, cold-blooded murder of a police officer to escape detection and arrest on a warrant and an attempted murder that lack any mitigating features.

{¶ 225} Bryan's history and background provide little in the way of mitigating value. We further find that none of the statutory mitigating factors in R.C. 2929.04(B)(1) through (B)(6) is applicable.

{¶ 226} We conclude that little weight should be given to mitigating factors under R.C. 2929.04(B)(7). Cassandra's testimony shows that Bryan was brought up in a good home and was taught positive values. Such evidence suggests that Bryan may have some rehabilitative potential. However, we accord little mitigating weight to Bryan's expressions of remorse during his unsworn statement. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 143; *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (retrospective remorse entitled to little weight in mitigation).

{¶ 227} Upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Bryan's murder of a police officer engaged in his duties, his murder of Officer Leon to escape detection, and his course of conduct in killing Leon and attempting to kill Niedhammer are grave circumstances. In contrast, Bryan offered no significant mitigation to weigh against these collective aggravating circumstances. In evaluating this sentence, we have considered the potential effect on the jury of the prosecutor's improper remarks during his arguments both in the guilt phase and the penalty phase. Nonetheless, because the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, we find that the death sentence in this case is appropriate.

{¶ 228} Finally, we find that the death penalty is proportionate to death sentences approved in similar cases. For murders of a law enforcement officer, see *State v. Jones*, 91 Ohio St.3d 335, 744 N.E.2d 1163; *State v. White*, 82 Ohio St.3d 16, 693 N.E.2d 772; and *State v. Mitts* (1998), 81 Ohio St.3d 223, 690 N.E.2d 522. For murders to escape detection, see *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; and *State v. Hicks*, 43 Ohio St.3d 72, 538 N.E.2d 1030. For course-of-conduct murders, see *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 714 N.E.2d 867 (one murder and one attempted murder); *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096 (one murder and one attempted murder); and *State v. Beuke*, 38 Ohio St.3d 29, 526 N.E.2d 274 (one murder and two attempted murders).

{¶ 229} Accordingly, we affirm Bryan's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

---

William D. Mason, Cuyahoga County Prosecuting Attorney, Kelley J. Barnett, A. Steven Dever and David Zimmerman, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and Patricia J. Smith, for appellant.