OPINION
{¶ 1} Timothy Allen was indicted for aggravated burglary in violation of R.C. 2911.11(A)(2). The indictment included two gun specifications. A jury found Allen guilty of the aggravated burglary charge, but not guilty of the gun specifications. He appeals his conviction and, in his sole assignment of error, claims errors based on the sufficiency and the weight of the evidence.
 Facts {¶ 2} Ebony Calloway lived in a small two-bedroom ranch-type house with her boyfriend and two children. Calloway testified that in the early morning of October 31, 2005, she was awakened by a squeak in the floor. She asked, "[W]ho's there[?]" and was told to be quiet. She rose up a little out of bed and heard, "I'm here to get my money, the guy in the gray truck owes me money." She asked "[W]ho[?]" and was told that it was "the guy in the gray truck, stop playing with me or I'm going to kill you and your kids."
 {¶ 3} Calloway said the intruder was pointing a gun at her while she was in bed, but she did not know whether it was a toy gun or a real gun. She testified there was some light in her bedroom from a dining-room chandelier she kept on low as a night light for her children.
 {¶ 4} Calloway told the intruder that there was a bucket of change under the bed. The intruder told her to roll over and put her face in the pillow. According to Calloway, he said, "I'm about to get down here and get this money, or I'll kill you and your kids." At that point, Calloway's live-in boyfriend, Elmo Graham, who drove a gray truck, pulled in the driveway. Graham testified that he got home between 1:30 and 1:40 a.m. The intruder grabbed the bucket of change and fled. Calloway called 911 and told Graham what had just happened.
 {¶ 5} Graham gave chase, at first on foot and then in his truck. Graham testified that while on foot, he got within five feet of the intruder's car, a black Cutlass Supreme, and was able to see the intruder's face. Although Graham also gave chase in his truck and described the car being chased to a 911 operator, he could not keep up with the fleeing intruder, so he returned home.
 {¶ 6} At about 2:00 a.m., Officer Jeffery Scholl located the car Graham had described in the parking lot of a nearby apartment complex and checked the license plate. While Officer Scholl waited for the results, he felt the hood of the car and found that it was warm. He testified that he saw "a whole lot of change" on the passenger side of the car seat and in the back. It turned out that the license plate was registered to Timothy Allen, who lived at the complex and whose reported physical build matched the description Calloway and Graham had given to police. Four or five minutes after Graham had returned home, the police asked him to go to the nearby apartment complex to identify the car they had found. Graham identified the car as the one he had chased.
 {¶ 7} Officer Scholl testified that he went to Allen's apartment and that Allen answered the door. Allen went outside and identified the suspected vehicle as his car. Upon questioning by Officer Scholl, Allen said that his car was warm because he had just taken out his dog. He explained that he was not allowed to have a dog in his apartment, so he had driven the dog a short distance away to urinate. Officer Scholl verified that Allen, in fact, had a dog.
 {¶ 8} Graham identified Allen at the apartment complex as the person who was in the car he had chased. Calloway was brought to Allen's apartment complex, and she also identified Allen as the intruder both by sight and by his voice. She testified, "What I definitely know, whether I was blind or whatever, is his voice." At trial, Calloway and Graham identified Allen as the intruder.
 {¶ 9} Calloway testified that after she and Graham had identified Allen at his apartment complex, they went home and looked over the house. She said that her barbeque grill had been moved from the side of her house to under her kitchen window in the rear of the house. The kitchen window was over the sink. The faucet had been moved to the side and kitchen items like cooking oil and dishwashing liquid on the windowsill had been moved off to the side. The cord to her kitchen phone also had been cut.
 {¶ 10} Officer Scholl said he questioned Allen's wife and daughters. He located the bucket taken from Calloway's bedroom in a storage bin that belonged to Allen's apartment. Allen was subsequently arrested.
 {¶ 11} Allen's defense was that he had not broken into Calloway's house. Allen testified that he had taken the dog out at 11:00 p.m. and returned about 11:15 or 11:20 p.m. When Allen returned, a coworker, Michael White, was outside Allen's apartment. Allen explained that he was a bouncer at three or four clubs, and that White was one of the persons with whom he worked. Allen testified that White had asked to borrow his car for an hour to visit his girlfriend who lived nearby. Allen let White use the car but did not tell his wife because she became angry when Allen lent his car to others.
 {¶ 12} According to Allen, White returned at about 2:01 a.m. Allen answered the door and slipped out to talk to White. White explained to Allen he had taken longer than expected because White and his girlfriend had gotten in a fight. Allen testified that White asked him to keep the bucket of coins for him because White did not want his girlfriend getting into it. Allen said he put the bucket in the storage bin because he did not want his wife to know about it.
 {¶ 13} Allen testified that he had tried to find White after he was arrested, but that he had been unsuccessful. Calloway and Graham both denied knowing Allen or White. Graham testified that he had "no idea" why Allen would have said to Calloway, "I'm here to get the money the guy in the gray truck owes me."
 {¶ 14} Marcella Allen, Allen's wife, testified that Allen had taken the dog out at about 11:00 p.m., "a few blocks down the street," and returned at about 11:20 p.m. After that, he had not left the apartment until someone came to the door at about 2:00 a.m. Allen went out into the hall and came back about five minutes later. The next knock on the door was from the police.
 {¶ 15} Marcella Allen brought to the trial a large, small-neck water bottle that contained change, and it was admitted as a defense exhibit. She acknowledged on cross-examination that the change in Allen's car could not have come from the water bottle, because when the prosecutor flipped the bottle over, the change in it did not spill out.
 The Offense {¶ 16} To convict Allen of aggravated burglary, the state was required to establish beyond a reasonable doubt that on or about October 31, 2005, in Hamilton County, Ohio, Allen had a deadly weapon or dangerous ordnance on or about his person or under his control and had trespassed into Calloway's house by force, stealth, or deception, when she was present, with the purpose to commit a criminal offense in the house.[1]
 Sufficiency {¶ 17} The Supreme Court of Ohio has recently stated that "[i]n reviewing a record for sufficiency, 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "[2]
 {¶ 18} There was sufficient evidence of Allen's guilt. Calloway testified that Allen had entered her house while she was in bed, pointed a gun at her, threatened to kill her and her children and stolen a bucket of coins from under her bed. Graham described the intruder's car to the 911 operator. A short time later, Officer Scholl found the still-warm car with change strewn throughout it. The officer identified Allen, whose physical build matched the intruder's, as the owner of the car. Calloway and Graham identified Allen as the intruder. The stolen bucket of change was found in Allen's apartment storage locker. A reasonable trier of fact could have found all of the essential elements of aggravated burglary beyond a reasonable doubt.
Weight of the Evidence
 {¶ 19} In State v. Thompkins,[3] the Supreme Court of Ohio stated, "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief " (Emphasis omitted.)
 {¶ 20} Calloway, Graham and Officer Scholl testified for the state. The evidence from these witnesses established that Allen had committed the offense. Allen and his wife testified in his defense. Allen claimed that he had not committed the offense. Allen testified that he had loaned his car to Michael White at the time the offense was committed. When White returned the car, the bucket of change was placed in Allen's storage bin.
 {¶ 21} The jury had important issues of credibility to decide. Allen disputed when he had first told the police that another person was involved. Officer Scholl testified that the first time Allen had claimed Michael White had used his car was when Allen was at the police station, about an hour after his arrest. Allen claimed he told the police while at his apartment complex that the change in his car had come from a bucket "that dude gave me." And on the way to the police station, Allen claimed he told the police, "[T]he bucket you all found, that's the dude's." At the station, Allen testified, he told them, "Michael White did it."
 {¶ 22} Allen disputed whether the window of the police car Calloway had been in was ever rolled down so that she could identify his voice. Marcella Allen testified that a woman in a police car shook her head "no" and shrugged her shoulders when asked to identify Allen. She said that the police had not rolled the window down. Officer Scholl disputed these versions of Calloway's identification. Allen claimed that there were discrepancies in the witnesses' descriptions of the shirt, pants, and head covering the intruder and Allen had worn that night.
 {¶ 23} Officer Scholl testified that Allen had explained at his apartment that the change in his car came from a five-gallon water jug that had fallen over. Allen denied that he had told the police about a water bottle or that the change had come from it. Yet, Marcella Allen brought to trial a water bottle used for change.
 {¶ 24} Allen raised questions about the diligence of the police in investigating the crime, because they did not take fingerprints at the scene of the crime or from the bucket of coins and, according to Allen, made no effort to locate White. On the other hand, Allen did not produce White at trial or any witness who could verify White's existence and whereabouts.
 {¶ 25} The jury heard Calloway testify, "What I definitely know, whether I was blind or whatever, is his voice." The jury also heard Allen testify and the following exchange between the prosecutor and Allen:
 {¶ 26} "Q. The defense attorney was having a hard time understanding you at first, would you agree you have a kind of unique voice?
 {¶ 27} "A. What are you saying?
 {¶ 28} "Q. You speak uniquely, differently, is that correct? Or is it just the defense attorney didn't understand you?
 {¶ 29} "A. Yeah, some people say they think I was born in — I talk like I'm from a western country. I'm going kind of slow, so maybe that — "
 {¶ 30} The weight of the evidence and credibility of the witnesses were primarily for the trier of fact to decide.[4] Sitting as a thirteenth juror, we do not disagree with the jury's resolution of the conflicting testimony.[5] Allen's conviction was not against the manifest weight of the evidence.
 Inconsistent Jury Verdicts {¶ 31} The jury found Allen guilty of aggravated burglary, but not guilty of the gun specifications. While this may not seem unusual, the jury instructions given in this case for aggravated burglary limited the definition of deadly weapon to a firearm. The jury was instructed, "Deadly Weapon. A firearm is a deadly weapon." The jury was not given the broader definition of deadly weapon contained in R.C. 2923.11(A), which would have allowed the jury to find that Allen had a gun, a bludgeon, or something else that was "an "instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."[6] The jury was separately instructed on the firearm specifications. In those instructions, the court told the jury that the term "firearm" meant "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant"
 {¶ 32} The jury's arguably inconsistent findings do not require a reversal. Where there is a conviction on the principal charge and an acquittal on a specification for identical behavior, the general finding of guilt is not invalid.[7] It is uncertain in this case how or why the jury arrived at its decision on the specifications, whether they believed it was a toy gun or that it was not capable of expelling projectiles. Nevertheless, that uncertainty does not mean that the jury was not convinced of Allen's guilt on the principal charge.[8]
 {¶ 33} We overrule Allen's assignment of error and affirm his conviction for aggravated burglary.
 Judgment affirmed.
[1] R.C. 2911.11(A)(2).
[2] State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36.
[3] 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
[4] State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116.
[5] Thompkins, supra, at 387.
[6] R.C. 2923.11(A).
[7] State v. Perryman (1976), 49 Ohio St.2d 14; 358 N.E.2d 1040, paragraph three of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3136; State v. Gardner, 2nd Dist. No. 21027, 2006-Ohio-1130, ¶ 31-33; State v. Kiser, 6th Dist. No. S-03-028,2005-Ohio-2491, ¶ 19-20; State v. Hampton, 1st Dist. No. C-010159, 2002-Ohio-1907.
[8] Hampton, supra.