OPINION
{¶ 1} Defendant-appellant Antwon Lanier appeals from his convictions entered in the Mahoning County Common Pleas Court. We are asked to determine whether appellant's retrial violated his double jeopardy rights after the court sua sponte declared a mistrial in the first action. We are also called upon to evaluate whether the state's exercise of one of its peremptory challenges on an African-American venireperson violated appellant's equal protection rights. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} Elijah Jackson testified that he was waiting at the bus stop in the companionship of a female at the corner of Market Street and Judson Avenue at 9:00 p.m. on July 27, 2006, when a car pulled up and appellant exited. (Tr. 204, 206). Mr. Jackson was wary of appellant as he believed appellant was "out to get" him. (Tr. 201, 207). Thus, Mr. Jackson began running; however, he returned when he realized that he did not want to leave the female behind.
 {¶ 3} Appellant stated that he wanted to speak to Mr. Jackson. (Tr. 208). However, according to Mr. Jackson, appellant then pointed a gun at Mr. Jackson's head and ordered him to empty his pockets. (Tr. 209). After Mr. Jackson complied, appellant instructed him to run. (Tr. 210). Mr. Jackson testified that appellant fired three shots at him as he ran. (Tr. 211). One shot hit him in the side requiring two weeks of hospitalization. (Tr. 211-212).
 {¶ 4} Appellant was indicted for aggravated robbery, which is a first degree felony, felonious assault, which is second degree felony, and two firearm specifications. His first trial began on February 21, 2006, when the jury was selected. On February 22, 2006, prior to opening statements, the court met with the assistant prosecutor and defense counsel off the record to discuss some problems.
 {¶ 5} First, the court put on the record that the prosecutor advised the court that she received problematic information yesterday. Specifically, certain witnesses disclosed to her that they received telephone calls advising them that appellant had threatened to kill those testifying against him. (02/22/06 Tr. 2). The court noted the prosecutor's concern that she is uncertain how to present her opening statement if some of the witnesses who said they would testify end up failing to appear. The *Page 2 
prosecutor added that they are trying to track down a letter allegedly penned by appellant indicating the threats to the person who then warned the witnesses. (02/22/06 Tr. 3-4).
 {¶ 6} Next, the court revealed another problem that arose that morning when Mr. Jackson, the victim, arrived at the courthouse and became ill. Deputies vocally opined that Mr. Jackson was high and escorted him to the bathroom. This occurred in the rotunda where the jurors for this case were gathered. Mr. Jackson thereafter indicated to the prosecutor that he was not under the influence of any substance.
 {¶ 7} The court then ordered a mistrial based upon the combined problems. (02/22/06 Tr. 4). The court found that the mistrial could not be attributed to any action of the state. (02/22/06 Tr. 5). The defense unsuccessfully objected, arguing that there was no evidence that appellant was responsible for the threats and also suggesting that witnesses often have second thoughts about testifying at the critical time of trial. (02/22/06 Tr. 5-6). Counsel expressly stated that the defense had no comment on the issue of the victim's illness, noting that he did not see the victim's condition. (02/22/06 Tr. 6).
 {¶ 8} The trial was then rescheduled for February 27, 2006. On that day, however, appellant asked to dismiss on double jeopardy grounds, to determine the competency of the victim due to his behavior before the first trial and to continue the jury trial. The trial court agreed to continue the trial and to hear his other motions on March 7, 2006.
 {¶ 9} At that hearing, Mr. Jackson testified that on February 22, 2006, he entered the courthouse feeling nervous about testifying in general and due to the warnings he received about threats to his life. In addition, he was not feeling well. He opined that these facts caused him to become ill and "spit up." (03/07/06 Tr. 8, 13, 16). He denied the use of any drugs that day or the night before. (03/07/06 Tr. 9). A deputy testified that he had verbally opined in the courthouse rotunda that appellant was high based upon appellant's act of bending over and spitting up instead of following his directions to the courtroom. (03/07/06 Tr. 21-22). The court was then presented with a letter from an inmate who wished to confirm appellant's intimidation of witnesses in return for leniency and protection. *Page 3 
 {¶ 10} The court was then presented with part of the aforementioned letter allegedly written by appellant to the mother of his child who resides in Texas. It was noted that so far only this portion of the letter had been received by the state as a fax failed to come through with the remainder of the letter. (03/07/06 Tr. 28). In this portion of the letter, the writer talks about getting out of jail and refers to being in jail due to he and his "squad" going "fatal" on someone for plotting to rob him. The letter states that there are some people he has to "take a look at" but that he would not be the "one to do them in" because he has other people who love him so much that they would "do the damn thing." The letter continues:
 {¶ 11} "Man Im go hurt someone up here that your real real real cool with and you really wouldn't want me to do it and I don't want to but I have to. I have no choice. I need answers and Im go get them one way or another. I got to do this but anyways im gonna chill out after I tie up a few strings out here and untie a few niggas brain cells and even your friend might lose his * * *."
 {¶ 12} The receiver of the letter took the reference to her good friend to mean state's witness Tristan Dreher (who the state thereafter had to seek a material witness warrant due to his fear of testifying). After the hearing, the court denied appellant's double jeopardy dismissal motion.
 {¶ 13} Trial then commenced on May 8, 2006, when a jury was selected. Defense counsel filed a Batson objection to the state's use of a peremptory challenge to excuse an African-American venireman. The state set forth its rationale, and the trial court found the state's explanation to be race-neutral. As such, the court overruled appellant's objection.
 {¶ 14} Trial proceeded, and on May 11, 2006, the jury returned guilty verdicts for both charges and both firearm specifications; they signed verdict forms finding appellant guilty as the principal offender rather than through complicity. On May 17, 2006, the court conducted appellant's sentencing hearing, and the sentencing entry was filed on May 25, 2006. Appellant was sentenced to maximum, consecutive sentences of ten years for aggravated robbery and eight years for felonious assault plus three years for the merged firearms specifications. Appellant filed timely notice of appeal. *Page 4 
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 15} Appellant sets forth three assignments of error, the first of which contends:
 {¶ 16} "THE TRIAL COURT ABUSED ITS DISCRETION IN DECLARING A MISTRIAL AND ALLOWING A RETRIAL IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF THEFIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION."
 {¶ 17} Before delving into appellant's arguments, we shall begin with an introduction of the relevant law as set forth by the Ohio Supreme Court. A criminal defendant is protected from multiple prosecutions for the same offense by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution made applicable to the states through theFourteenth Amendment. State v. Loza (1994), 71 Ohio St.3d 61, 70, citingOregon v. Kennedy (1982), 456 U.S. 667. Jeopardy attaches when the jury is impaneled and sworn in. State v. Gustafson (1996), 76 Ohio St.3d 425,435. However, the attachment of jeopardy refers to when the clause is implicated and thus when certain tests are applicable. In other words, not all retrials after jeopardy attaches are precluded. See State v.Glover (1988), 35 Ohio St.3d 18, 19. Rather, if a mistrial was properly granted, then retrial is constitutionally permissible. Id. at 19-20.
 {¶ 18} The reviewing court examines the trial court's decision to grant a mistrial with deference. Id. at 19. A balancing test is employed whereby appellant's right to be tried by the original tribunal is weighed against the public's interest in the efficient implementation of justice. Id. At times, the public's interest in a fair trial dominates over appellant's right to have his fate determined by a certain tribunal. Id. Thus, "[w]here the facts of the case do not reflect unfairness to the accused, the public interest in insuring that justice is served may take precedence." Id. In evaluating the propriety of a mistrial order, the reviewing court should apply flexible standards "due to the infinite variety of circumstances in which a mistrial may arise." Id. at 19, citing United States v. Jorn (1971), 400 U.S. 470, 480.
 {¶ 19} Even when prosecutorial misconduct is the impetus for the mistrial, retrial is not barred unless that misconduct was "designed to subvert the protections afforded by the [double jeopardy] clause."Glover, 35 Ohio St.3d at 20, citing Kennedy, *Page 5 456 U.S. at 675-676. If there is no prosecutorial design to goad the granting of a mistrial and if the trial court sua sponte declares a mistrial, retrial is not barred if there was either: (1) a manifest necessity for ordering a mistrial; or (2) a situation where the ends of public justice would be defeated without the order of mistrial.Glover, 35 Ohio St.3d at 19, citing Arizona v. Washington (1978),434 U.S. 497.
 {¶ 20} Manifest necessity does not mean strict necessity.Glover, 35 Ohio St.3d at 20. Rather, it means a high degree of necessity. Id. at 19-20. The concept of "the ends of public justice" has also been described as "the public's interest in fair trials designed to end in just judgments." Id. at 19, quoting Wade v. Hunter (1949),336 U.S. 684, 689.
 {¶ 21} The trial court's decision as to whether there existed a manifest necessity or whether the ends of public justice would be defeated is not to be reversed absent an abuse of discretion.Glover, 35 Ohio St.3d at 19, 21 (pointing out that the trial court is in the best position to evaluate the situation). The Ohio Supreme Court has further stated that the fact that another court may have resorted to alternative remedies (such as a continuance or curative instructions) is not dispositive. Id. at 19-20 (disregarding the fact that another judge may have resorted to alternative measures), citing Washington,434 U.S. at 511.
 {¶ 22} Here, the trial court was faced with two main contemporaneous problems. First, the prosecutor received information the prior evening that threats were conveyed to various witnesses. Specifically, they were informed that if they testified against appellant, they would be killed. The state was in the process of tracking down a letter allegedly penned by appellant to the person who advised officials and the witnesses of the death threats. Considering the nature of the case before the court in the first place, there was rational concern that some of the state's witnesses would fail to appear or would not testify truthfully out of a fear that had not yet been resolved or dissipated by law enforcement investigation and intervention.
 {¶ 23} Second, the victim, who was the state's key witness, arrived at the courthouse ill and in fear of retaliation. After asking a deputy for directions to the proper courtroom, he bent over and spit up. The deputy jumped to the conclusion that the victim was high and publicly accused him of such in the courthouse rotunda where jurors were lingering. The victim was then escorted to the restroom by officers. *Page 6 
 {¶ 24} We must determine whether the trial court abused its discretion in finding that under the combination of these circumstances there was a high degree of necessity for a mistrial or that the ends of public justice would be defeated in the absence of a mistrial. Glover,35 Ohio St.3d at 19. An abuse of discretion is a decision that is unreasonable, unconscionable or arbitrary. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. It is more than an error of judgment. Id.
 {¶ 25} We start our analysis by making note of some of appellant's individually sketched arguments and finish by addressing his main contention in conjunction with all other arguments. First, we point out the inconsistencies surrounding appellant's contention that the mistrial order improperly deprived him of the opportunity to attack the credibility of the victim at a crucial time when he may have been high. This statement is contradictory to appellant's claim that the court should have ordered a continuance instead of a mistrial. That is, a continuance also would have deprived appellant of this opportunity. Moreover, this argument by itself fails to recognize that the court must consider all circumstances existing at the time, including the threats to fearful witnesses causing the state to question how to present its opening. We also note that defense counsel refrained from commenting on this ground for mistrial at the time he was asked to present objections. Rather, he focused on discounting the threats to the witnesses.
 {¶ 26} Next, we refer to appellant's contention that the court should have questioned the jurors as to whether they viewed the victim's behavior in the rotunda or heard the deputy's statement. The court stated on the record that jurors were present when the incident openly occurred in the middle of the rotunda. Had the court questioned the jurors on whether they saw the victim's actions, heard the officer's accusation or saw the officers escort the victim away, this could have resulted in various prejudices. For instance, even if the jurors could not have identified the man as the victim in their case, they would be able to make the connection once the court related the incident to the case at bar. Additionally, if it turned out from questioning that the jurors neither saw nor heard the incident, the questioning could trigger the juror to harbor suspicions that an involved party (including the defendant himself) committed some questionable act that morning. *Page 7 
 {¶ 27} If it turned out some jurors clearly saw or heard the incident, appellant states that the court could have issued a curative instruction to remedy the problem. A curative instruction is an option that the trial court could weigh and then discard as being insufficient in the face of a law enforcement officer's expressed opinion about the victim's mental/physical state. See Glover, 35 Ohio St.3d at 19-20, citingWashington, 434 U.S. at 511. Further, the court may have considered such procedure to be irrelevant where it would not have solved the remaining problem with the threatened and absent witnesses, which is part of the circumstances presented to the trial judge that must be viewed in their totality. See Wade v. Hunter (1940), 336 U.S. 684, 688.
 {¶ 28} Next, we point out that the trial court need not make a written decision on the reasons for granting a mistrial or otherwise explain why he believes there is a manifest necessity for a mistrial or why the ends of public justice would be defeated without a mistrial. Arizona v.Washington (1978), 434 U.S. 497, 517. Rather, the reviewing court can consider the record to determine if a basis for mistrial was adequately disclosed. Id. Here, the state and the trial court itself placed the impetus for the mistrial on the record.
 {¶ 29} Appellant then contends that the declaration of a mistrial was provoked by the state's actions. Although the stimuli for the mistrial were certain events disclosed by the state, the events were not the product of state action or inaction. The trial court found that the mistrial was not provoked by the state in a manner designed to subvert the protections afforded by the double jeopardy clause. SeeGlover, 35 Ohio St.3d at 20, citing Kennedy, 456 U.S. at 675-676. There was no indication or suggestion below that the state designed the victim's public display of illness or the deputy's public proclamation of the opined cause of that illness. There was also no indication or allegation that the state designed the witness intimidation or the witnesses' fear of retaliation for testifying. The court found credible the prosecutor's claim to have received telephones calls the prior evening disclosing that threats were made on witnesses' lives. We also note that there were no incidents of over-reaching prior to the issues that arose on the morning of trial so as to suggest some kind of pattern. See Kennedy, 456 U.S. at 680 (Powell, J., concurring). *Page 8 
 {¶ 30} We proceed to address appellant's view that the state's unsupported allegations that he intimidated witnesses constituted prosecutorial misconduct. As aforementioned, the court found the state was not responsible for the issues that arose. Although it is possible that appellant was not responsible for the threats either, this does not automatically bar the state from retrying him where the court sua sponte declares a mistrial. See Washington, 434 U.S. at 514. Rather, the trial court has sound discretion to grant a mistrial under circumstances that are not irrational or irresponsible. Id. Moreover, regardless of whether appellant was the intimidator, and it is not improper for the state to wonder if he was, the allegation that someone warned the witnesses that there was a threat against their lives is a pertinent consideration and a situation demanding disclosure, as is the relay of information that witnesses in fear of their life expressed intent to disobey the subpoena. We note the state's concern that if their opening statement outlined the facts that they intended to provide, but then certain witnesses failed to show, the prosecutor would be prejudiced by outlining a factual scenario it might not be able to support depending upon which subpoenaed witnesses showed up, and the defendant could be prejudiced by statements made by the prosecutor which were rendered irrelevant and unprovable by the absence of witnesses. The court could choose to avoid this situation where the absence of a witness is unpredictable, unavoidable, even understandable and allegedly due to threats of the defendant himself.
 {¶ 31} Finally, appellant claims that the declaration of a mistrial was unnecessary and complains that the trial court made no effort to avoid a mistrial by ordering a continuance. He cites the United States Supreme Court's Jorn case for his claim that it is an abuse of discretion to declare a mistrial when the court's motivation was not to protect the defendant and where the court never considered the granting of a continuation.
 {¶ 32} In Jorn, the opening statements had been presented, an IRS agent had been called to the stand to introduce tax returns which the government alleged the defendant had fraudulently assisted in preparing, and the exhibits had been stipulated to and admitted into evidence. The state then called its first of five taxpayer-witnesses. The defense asked the court to advise the witness of his rights. The court did so, and the witness assured the court that the IRS already so advised him. The *Page 9 
court asked if the remaining witnesses were also advised of their rights to which the prosecutor responded in the affirmative. The court expressed disbelief that the IRS revealed the right to the witnesses at the first encounter and then opined that if the IRS in fact disclosed such rights, the warnings were probably inadequate. Despite the witness's statement from the stand that he was comfortable testifying, the court declared a mistrial so that all taxpayer-witnesses could consult with attorneys. The same trial judge thereafter dismissed the charges based upon double jeopardy. United States v. Jorn (1971),400 U.S. 470.
 {¶ 33} The Supreme Court stated that manifest necessity or ends of public justice has long been the test for the sua sponte granting of a mistrial. Id. at 481, citing United States v. Perez (1824), 9 Wheat. 579. The Court noted that the test can be varied to uphold the discretion of the trial court if the judge was acting in the sole interest of the defendant. Id. at 482, citing Gori v. United States
(1961), 367 U.S. 364. If not, the traditional test stands. The Court found that as for the alternative test, the mistrial was not ordered in the sole interest of the defendant. Id. at 483. As for the main manifest necessity or public justice test, the Court concluded that the mistrial was unnecessary and thus the trial court abused its discretion in declaring the mistrial. Id. at 486-487.
 {¶ 34} The Supreme Court focused on the fact that the first witness and the prosecutor assured the trial court that the five taxpayers had all been warned of their constitutional rights. Id. at 487. The Court noted the trial court's unsupported disbelief of these facts and pointed out how the court interrupted the state before an answer could be presented as to how the state could try a case without incriminating the taxpayers. Id. The Supreme Court stated that the trial court acted so abruptly that neither the state nor the defendant had a chance to object to the grant of mistrial. Id. In detailing this abruptness, the Supreme Court also mentioned that no consideration was given to the possibility of a continuance. Id. The Court concluded that the trial judge made no effort to exercise sound discretion and to take all circumstances into account in order to ensure there was a manifest necessity to declare a mistrial. Id.
 {¶ 35} Jorn can be distinguished on various grounds. For instance, the reason for the mistrial in Jorn was much less pressing than death threats to witnesses (combined with a sick victim-witness whom a police officer publicly accused of *Page 10 
illegality). Moreover, the trial court in Jorn was seen as attempting to protect witnesses against future charges rather than trying to protect the public's interest in a just judgment in the case at hand. Additionally, the jury here had not even heard opening statements, whereas the jury in Jorn had listened to opening statements, had witnessed an IRS agent being called to the stand and had viewed the admission of the main evidence against the defendant (the fraudulent tax returns).
 {¶ 36} Contrary to appellant's suggestion, the Jorn case does not mandate some kind of statement on the record that the trial court considered a continuance; nor does it require an express revelation of the court's thought process. Although the Jorn Court stated that it was clear the trial court did not consider the possibility of a continuance, the Court was mainly concerned with the rash and irrational decision of the trial court and the groundless accusations made. See Illinois v.Somerville (1973), 410 U.S. 458, 470 (explaining the Jorn decision by noting that the judge in Jorn displayed an erratic attitude).
 {¶ 37} Regardless, the Supreme Court has subsequently explicitly rejected a requirement of particular findings or an explanation of the reasons for choosing mistrial over other options. Arizona v.Washington (1978), 434 U.S. 497, 517. Unlike the impulsive act of the trial judge in Jorn, it can be seen from the record here that the trial court had time to consider the matter. The record establishes that the situation had been fully discussed in chambers with both counsel present prior to adjourning to the courtroom. Thereafter, the court presented the issues on the record and again listened to the concerns of the state and the objections of the defense to the court's suggested remedy of a mistrial.
 {¶ 38} As aforementioned, the fact that another court may have used alternative measures, such as a continuance, is not the dispositive issue. See Glover, 35 Ohio St.3d at 19-20, citing Washington,434 U.S. at 511. Rather, each trial judge has the discretion to monitor the fairness and the context of the trials before it and to grant a mistrial if there is deemed a high degree of necessity or the public interest otherwise requires. See id.
 {¶ 39} The Jorn Court noted that the manifest necessity rule is not to be mechanically applied and acknowledged that the defendant's right can be subordinated to the public interest in circumstances where the ends of justice would be *Page 11 
defeated by dismissal. Jorn, 400 U.S. at 480. The Jorn Court also pointed out that appellate courts traditionally give weight to and defer to the trial courts' "on the scene" assessment as to the necessity for a mistrial. Id. at fn. 7.
 {¶ 40} Manifest necessity or the ends of public justice is not a rigid rule that requires forsaking the public interest in order to uphold some unbending right of the defendant. See Somerville, 410 U.S. at 463 (where the Court upheld granting of mistrial due to defect in indictment which could not be amended and which would have required overturning of conviction on appeal). We recognize that manifest necessity is a heavy burden. Washington, 434 U.S. at 506. However, the word necessity is not to be interpreted literally as there are degrees of necessity. Id. The degree of necessity to be applied here is high, not strict, exact or absolute. Id.
 {¶ 41} Although not pointed out by appellant, we acknowledge that theWashington Court pointed out in dicta how the trial court should scrutinize a situation more strictly where the state claims a critical prosecution witness is unavailable, noting the old English prosecutorial practice of using the first trial as a trial run, realizing the state's evidence is weak and then provoking a mistrial to gain a second chance. Id. at 507-508. Here, there is no contention the state knew of the witness situation prior to the jury selection and swearing in. To the contrary, the Washington Court subsequently explained its observation and seemingly limited its dicta to situations where the state proceeded to trial knowing the witness situation ahead of time. Id. at fn. 24. This conclusion is supported by the holding in two cases directly dealing with witness unavailability.
 {¶ 42} In a much-cited Supreme Court case, a defendant was court-martialed by the United States military in Germany for raping two women during the war. Wade v. Hunter (1949), 336 U.S. 684, 688. A trial was held where evidence was presented and arguments were presented. The trial was continued; however, a week later, the charges were dismissed with intent to refile later. By way of explanation, it was stated that two witnesses, the victim's mother and father, were unable to be present due to sickness. It was also revealed that due to the tactical situation, the distance has become too great for these witnesses to travel; so, the next trial was to be held in the vicinity of the offenses. *Page 12 
 {¶ 43} A court later reviewing the defendant's request for release held that these witnesses were not manifestly necessary and thus the defendant's double jeopardy rights were violated. Id. at 691. On appeal, the defendant urged the Supreme Court to adopt a certain interpretation of the manifest necessity doctrine so that the absence of a witness could never be a justification for discontinuing trial. Id. The Supreme Court, however, refused to adopt such a rule, thus recognizing that witness absence can be a consideration in granting a mistrial. Id.
 {¶ 44} The Wade Court disclosed that all circumstances must be considered, and the Court then deferred to the trier of fact's decision. Id. at 691. The Court noted that there were no indications of bad faith on the part of the prosecution. Id. at 692. The Court found that the tactical situation with relation to the absent witnesses was sufficient to uphold the discretion of the court-martial that a manifest necessity existed. Id. The Court then upheld the grant of mistrial and validated the retrial. Id.
 {¶ 45} We recognize that a later decision found retrial barred by double jeopardy in an absent witness case. Downum v. United States
(1963), 372 U.S. 734. However, the prosecution in that case knew its witness had not been subpoenaed and could not be found. Still, the prosecution proceeded through jury selection and swearing in and then sought a mistrial after lunch break. Clearly, Downum is distinguishable. In fact, the Downum Court again refused to hold that the absence of a witness can never justify the discontinuance of a trial, noting that each case turns on the particular facts. Id. at 737. Additionally, as aforementioned, the Wade case is still cited in more recent Supreme Court decisions, including Jorn.
 {¶ 46} The above cases are more on point than the Jorn case appellant cites. We also note that Jorn prefaces its statement about the flexibility of the manifest necessity rule by noting that a criminal trial is "a complicated affair" as the proceedings are dependent on "the most elementary of sort of considerations, e.g., the health of the various witnesses * * *." Jorn, 400 U.S. at 480. Thus, Jorn recognizes that witness issues can allow for a proper mistrial under certain circumstances. Appellant does not cite either Wade or Downum. Each case allows retrial after a mistrial where a critical witness is absent and the state was unaware of the absence until after the jury was sworn in. *Page 13 
 {¶ 47} The rationale is even stronger when the reason for the witness unavailability is death threats. In fact, such fact brings the situation into a different category entirely. That is, the court can choose to protect the substantive integrity of the proceedings and the bodily integrity of the participants by declaring a mistrial in order to further determine if there is in fact a valid threat. Likewise, the court could choose to dismiss a jury who had heard no arguments or evidence in order to issue material witness warrants, which could take longer to satisfy than a continuance could accommodate. The court can use its discretion to estimate the time needed and to determine that such time is inappropriate to keep a jury dangling. Notably, the mistrial was ordered after the jury was impaneled but prior to even opening statements, which timing further minimizes the prejudice to appellant and supports the public interest. See United States v.DiFranceso (1980), 449 U.S. 117, 128 (concern that government may gain advantage as to own or defendant's weaknesses if the first trial proceeds so far).
 {¶ 48} Here, the trial court was presented with two situations at the same time and had to consider all of the strange circumstances existing before it in order to evaluate the situation. The trial court occupied the best position from which to weigh the situation, to determine the state's motivation and sincerity, and to fashion an appropriate remedy. The trial court could reasonably find a high degree of necessity for declaring a mistrial. The trial court could also reasonably find that the public's interest in a fair trial and the efficient implementation of justice outweighed appellant's right to have his fate determined by a particular tribunal. Although a reasonable judge could determine that a better practice would have been to casually inquire into the juror's observations in the rotunda and to continue the matter so the state could clarify the other witness situation and issue material witness warrants and so law enforcement could investigate the gravity of the situation, such determination does not mean there is no other option in a trial court's sound discretion. See Glover, 35 Ohio St.3d at 19-20, citing Washington, 434 U.S. at 511. For all of the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 49} Appellant's second assignment of error alleges: *Page 14 
 {¶ 50} "THE TRIAL COURT ERRED IN NOT SUBMITTING TO THE JURY A VERDICT FORM ON THE CHARGE OF COMPLICITY, THEREBY VIOLATING APPELLANT LANIER'SFOURTEENTH AMENDMENT RIGHT TO DUE PROCESS."
 {¶ 51} Appellant believes that the court is required to provide verdict forms that give the jury the opportunity to characterize appellant as the principal offender or as a complicitor. He argues that the failure to provide such forms would prejudice him because he believes a complicitor would not be sentenced as harshly and because he would have objected to the sufficiency of the evidence to support complicity if found guilty only as a complicitor. He then states that his lack of objection waives all but plain error in the failure to object to the verdict forms, citing State v. Hill (1995),73 Ohio St.3d 433, 437.
 {¶ 52} Regardless of whether the argument has merit, appellant's initial arguments are based on the mistaken belief that the court failed to submit the desired verdict forms to the jury. As can be seen in the docket and the transcript, the jurors were in fact provided with verdict forms on complicity. (Tr. 428-429). After receiving the state's response on this issue, appellant realized this fact and now agrees that the forms were indeed utilized here. As such, this assignment of error is moot.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 53} Appellant's third and final assignment of error provides:
 {¶ 54} "THE TRIAL COURT ERRED BY OVERRULING APPELLANT LANIER'S OBJECTION TO THE PROSECUTION'S DISCRIMINATORY DISMISSAL OF AN AFRICAN AMERICAN JUROR, THEREBY VIOLATING APPELLANT LANIER'S FOURTEENTH AMEDNMENT RIGHT TO EQUAL PROTECTION."
 {¶ 55} Appellant urges that the state's use of its second peremptory challenge to excuse the potential juror, whom we shall call Juror Number Fourteen, was discriminatory based upon his African-American race, citing Batson v. Kentucky (1986), 476 U.S. 79. To support this contention, appellant points to a select portion of the state's voir dire of this venireman and characterizes it as more probing and different than the questioning of the other potential jurors.
 {¶ 56} The state asks us to review the entire questioning of this potential juror and the entire voir dire for context. For instance, the state initially set forth two scenarios to explain complicity. The first involved how each person in the chain of *Page 15 
production at a fast-food restaurant helps to serve a customer's food. (Tr. 61-62). The second involved a bank robbery where different criminals perform different tasks to achieve a common goal such as driver, principal robber, floor plan supplier and security analyst. (Tr. 62-64). Upon receiving answers from various potential jurors that the accomplices should not be held liable to the same extent as principals, the state asked them each if they could follow Ohio law if it holds accomplices accountable to the same extent as the principal. The state then delved into certain jurors' answers. (Tr. 64-67).
 {¶ 57} Thereafter, a potential juror was excused, and Juror Number Fourteen was called to the panel for questioning. The state asked what he thought about complicity and what complicity meant to him. (Tr. 139). He responded, "I have no idea." The state then asked if he remembered the fast-food example and the bank robbery examples. (Tr. 139-140). The state asked if all involved in the robbery should be held accountable to which Juror Number Fourteen answered yes. (Tr. 140). Contrary to appellant's suggestion, further questioning was warranted as this merely stated they should all be held accountable, not that they should all be held accountable to the same degree.
 {¶ 58} Upon a further question, Juror Number Fourteen revealed that he believed that each should be held accountable only "to a certain extent." (Tr. 140-141). When the state reminded him of the hypothetical Ohio law on complicity, he responded twice that he is not comfortable with such law. (Tr. 141). On further questioning, he said that he would have to follow the law and would be able to do so. (Tr. 142).
 {¶ 59} The state moved on to discuss the standard of beyond a reasonable doubt with this potential juror as it had already done with the starting panel. The state asked, "Do you think you would hold us to a higher standard, that we have to prove the case beyond all doubt?" Juror Number Fourteen responded, "Pretty much, yes." The state probed, "So you would think we would have to prove the case beyond all doubt?" to which he responded, "Uh-huh." (Tr. 142). He concluded, however, that he could be a fair and impartial juror if the court instructs on a different standard. (Tr. 142-143).
 {¶ 60} Defense counsel then noted to Juror Number Fourteen that when the judge called his name, it was like saying someone stole his car outside the *Page 16 
courthouse. Juror Number Fourteen then admitted that he was not too excited about being there as he did not care for judging people. However, he then said that he wanted to sit on the jury. (Tr. 143). Defense counsel went on to receive appropriate answers about the state's standard of proof. (Tr. 144-145).
 {¶ 61} The state thereafter exercised its second peremptory challenge on Juror Number Fourteen, who was African-American. (Tr. 146). The first juror, peremptorily excused was also an African-American; however, his excusal is not at issue. (Tr. 176). Rather, the defense only objected to the use of the second challenge based upon Batson. (Tr. 146, 176).
 {¶ 62} When asked for their race-neutral explanation, the state replied that Juror Number Fourteen was not really paying attention to any of the questions while he was sitting in the back. The state also pointed out that he originally replied that he would hold the state to a higher standard. The state acknowledged that he changed this upon questioning by the defense, but described him as indecisive. In fact, the state characterized his answers to all questions as delayed. (Tr. 177).
 {¶ 63} The defense accused the state of asking soft-ball questions to a similarly situated white venireperson but asking hard core questions to Juror Number Fourteen. The state responded that the extensive questioning was due to his indecisiveness and the hard time he had answering any of the questions asked, whereas the other juror had an answer right away. (Tr. 179). The state also emphasized that two other jurors retained by the state are African-American. (Tr. 180).
 {¶ 64} The court recapped Juror Number Fourteen's answers and found that the state provided a race-neutral explanation for excusing this juror through a peremptory challenge. (Tr. 80). The court also confirmed that two non-challenged jurors are also African-American. (Tr. 180-181).
 {¶ 65} A Batson objection to the use of a peremptory challenge invokes a three-step process. State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106. First, the opponent of the peremptory challenge must make a prima facie showing of racial discrimination. Id. This requires only the raising of an inference that the peremptory challenge was used to exclude a person based upon race. State v. Hernandez (1992),63 Ohio St.3d 577, 582. *Page 17 
 {¶ 66} Second, if the trial court finds a prima facie case was made, the proponent of the peremptory challenge must provide a racially-neutral explanation. Bryan, 101 Ohio St.3d 272 at ¶ 106. We note, however, that the proponent's rationale need not rise to the level justifying a challenge for cause. Id. Still, the state cannot rely on bare claims of good faith. Hernandez, 63 Ohio St.3d at 582.
 {¶ 67} Finally, the trial court must decide based upon all the circumstances, whether the proponent's explanation is pretextual and thus the opponent has proved purposeful racial discrimination or whether the proponent had no discriminatory intent. Bryan, 101 Ohio St.3d 272
at ¶ 106. A trial court's findings on these matters are entitled to deference, since such findings depend primarily upon an evaluation of credibility. Id. at ¶ 110. Thus, a trial court's decision that the state lacked discriminatory intent will not be reversed on appeal unless clearly erroneous. Id. at ¶ 106.
 {¶ 68} Here, the inference of racial discrimination was raised in a prima facie case. Since the court asked for the state's explanation, it apparently found that appellant met his burden of establishing a mere prima facie case. The state then set forth three main reasons for excusing Juror Number Fourteen.
 {¶ 69} First, the state was worried about his inattentiveness. As defense counsel pointed out, he jumped, possibly like he had been sleeping, when his name was called to participate on the panel. As the state points out, Juror Number Fourteen said he had no idea about complicity even after sitting through the questioning of the potential jurors before him on the topic.
 {¶ 70} Second, the state expressed concern about his indecisiveness. This is a matter that is not expressed in the transcript. That is, we are unable to hear the pauses before and inflection of uncertainty during each answer. However, the trial court was present and in the best position to evaluate the state's concern on this issue.
 {¶ 71} Third, the state voiced that they were worried that he twice seemed to express that the state should be held to a beyond all doubt standard. Although the defense later enabled him to express that he would follow the standard as instructed, the state could still use this in combination with its other concerns as part of its rationale. *Page 18 
 {¶ 72} Finally, we note that the state only used two of its three peremptory challenges. Although the first challenge was also against an African-American, the defense expressly revealed to the trial court that it had no problem with the first challenge. (Tr. 178). Moreover, two other African-Americans were left on the jury even though the state was not out of challenges.
 {¶ 73} In conclusion, we considered the entire voir dire of all potential jurors. We recognized the fact that the trial court occupied the best position from which to determine the state's intent. And, we reviewed all of the remaining pertinent facts and circumstances listed supra. Upon these considerations, we conclude that the trial court's decision to overrule the defense's Batson objection was not clearly erroneous as required for reversal. In fact, the trial court could reasonably find that the state's race-neutral reasons were not a pretextual front used merely to disguise racial discrimination. This assignment of error is overruled.
 {¶ 74} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1